1 | GLENN AGRE BERGMAN & FUENTES LLP
LYN R. AGRE (CASBN 178218)
2 | EDWARD E. SHAPIRO (CASBN 326182)
44 Montgomery Street, Floor 41
3 | San Francisco, CA 94104
Telephone: (332) 233-5784
4 | lagre@glennagre.com
eshapiro@glennagre.com
5 |
LAW OFFICES OF ELIZABETH GROSSMAN
6 | ELIZABETH GROSSMAN (CASBN 104483)
1010 Grayson St.
7 | Berkeley, CA 94710
Telephone: (510) 548-5106
8 | office@elizabethgrossmanlaw.com

9 |
*Attorneys for Plaintiffs*
10 |

11 | **UNITED STATES DISTRICT COURT**

12 | **NORTHERN DISTRICT OF CALIFORNIA**

13 |

14 |

15 | MICHELLE SAXTON, as Guardian | CASE NO.
ad Litem for M.M., a minor;
16 | JAMES CLARK; ESTATE OF | **COMPLAINT FOR DAMAGES FOR**
AMBER MARCOTTE; ESTATE | **VIOLATIONS OF CIVIL RIGHTS UNDER**
17 | OF MICHAEL MARCOTTE, | **18 U.S.C. § 1983**

18 | Plaintiffs, | <u>JURY TRIAL DEMANDED</u>

19 | v.

20 | COUNTY OF SONOMA;
SONOMA COUNTY BOARD OF
21 | SUPERVISORS; SONOMA
COUNTY SHERIFF'S
22 | DEPARTMENT; SONOMA
COUNTY SHERIFF MARK
23 | ESSICK, DOES 1-50 inclusive,

24 | Defendants.

25 |

26 |

27 |

28 |

Plaintiffs Michelle Saxton, as Guardian ad Litem for M.M., a minor, the Estate of Amber Marcotte, the Estate of Michael Marcotte, and James Clark, the brother of Amber Marcotte and the son of Michael Marcotte ("Plaintiffs"), allege upon information and belief as follows:

**NATURE OF THE ACTION**

1.      Plaintiffs present federal claims for relief that arise under 42 U.S.C. § 1983, and supplemental state law claims actionable under California Civil Code § 52.1.

2.      For all state claims asserted in this Complaint, Plaintiffs filed timely (within six months of the incident) administrative claims with the government entities involved, pursuant to California Government Code § 910. The County of Sonoma rejected those claims by letter mailed on June 11, 2021.

**JURISDICTION AND VENUE**

3.      This Court has subject-matter jurisdiction over the claims arising under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution pursuant to 28 U.S.C. §§ 1331 and 1343.

4.      This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367. Plaintiffs' state law claims are so related to Plaintiffs' federal law claims that they form part of the same case or controversy.

5.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because the underlying acts, omissions, injuries, and related facts giving rise to Plaintiffs' claims occurred within this District.

6.      The Court has personal jurisdiction over Defendants.

**PARTIES**

7.      Plaintiff Michelle Saxton is an individual residing in Sonoma County and the legal guardian of minor M.M., the daughter of decedent Amber Marcotte. Plaintiff James Clark is an individual residing in Marin County, the brother of and next-of-kin to Amber Marcotte, the son of Michael Marcotte, as well as a beneficiary of Michael Marcotte's family trust. Amber Marcotte ("Ms. Marcotte" or "Decedent") died intestate.

8.      Defendant County of Sonoma ("Sonoma County" or the "County") is a political subdivision of the State of California existing under the laws and Constitution of the State of California.

9.      At all times relevant herein, Defendant Sonoma County Board of Supervisors were the elected office holders authorized and responsible for supervising the policies and practices of the agencies of the County, including the Sheriff's Department, and held a position of responsibility for ensuring compliance by County agencies with the U.S. Constitution, and all other applicable federal, state and local law. At all relevant times, the Board of Supervisors was a policymaking, managerial, supervisorial, and legislative branch of the County of Sonoma.

10.     Defendant Sonoma County Sheriff's Department ("Sheriff's Department") is an agency of Sonoma County and is therefore separately subject to suit as a public entity. Defendant Sheriff's Department is and was at all relevant times alleged herein, the law enforcement agency for the County. Sheriff's Department and its employees are responsible for primary law enforcement services for the unincorporated areas of Sonoma County, the Town of Windsor, and the City of Sonoma. In addition to its law enforcement responsibilities, the Sheriff's Department maintains and operates the County's detention facilities.

11.     Defendant Mark Essick is the elected Sheriff of Sonoma County and as such is a policymaker for the Sonoma County Sheriff's Department. Sheriff Essick is responsible for enforcing the policies of the Sheriff's Department. Plaintiffs are informed and believe Sheriff Essick is and was at all relevant times an employee of the County. Sheriff Essick was elected Sheriff in 2018 and sworn in as Sonoma County Sheriff on January 7, 2019. Prior to his election, Defendant Essick held command positions within the Sheriff's Department for various responsibilities and functions. As Sheriff, Defendant Essick is responsible for the customs, policies, training, supervision, and practices complained of herein.

12.     At all times relevant herein, Defendant Essick is and was the individual authorized and responsible for the policies and practices of the Sheriff's Department and was the individual holding a position with the responsibility for ensuring compliance by its officers with the U.S. Constitution, and all other applicable federal, state and local laws. At all relevant times, Defendant

COMPLAINT
Case No.

Essick was a policymaking, managerial, supervisorial, and executive employee of Defendant County.

13.     DOES 1 through 50 inclusive, were duly authorized employees and agents of Defendant County, and the actions alleged herein were committed by Defendants, each of them, under color of law as agents purportedly acting under the authority and ratification of their principal, Defendant County.

14.     Each defendant named herein was acting under color of state law when they committed each of the acts alleged herein.

15.     In doing acts described herein, Defendants Essick, Sonoma County Sheriff's Department, and DOES 1 through 50 inclusive, were acting on the implied, and actual permission and consent of Defendants Sonoma County and Sonoma County Board of Supervisors.

16.     At all relevant times, Defendant Sonoma County, and its agency, the Sheriff's Department, had the legal duty to oversee and supervise and review the hiring, confirm the fitness of, regularly review the performance of, investigate complaints involving, continued employment, training, and review conduct of individual defendants Essick and DOES 1 through 50 inclusive.

17.     The true names of Defendants DOES 1 through 50 inclusive, are unknown to Plaintiffs, who therefore sue these defendants by such fictitious names. Plaintiffs will seek leave to amend this complaint to show the true names and capacities of these defendants sued as DOES, when the true names and capacities have been discovered or ascertained.

18.     At all relevant times, Defendants DOES 1 through 30, inclusive, were law enforcement officers employed by the Sonoma Sheriff's Department who participated in the violation of Plaintiffs' protected rights, or who materially assisted other defendants in the violation of those rights, or who knowingly assisted defendants in the concealment of, and/or knowingly made false denials of the material facts of the violation of Plaintiffs' protected rights.

19.     At all relevant times, Defendants DOES 31 through 50, inclusive, were managers, supervisors, administrators, and service providers hired and supervised by Sonoma County or the Sonoma County Sheriff's Department.

**COMPLAINT**
**Case No.**

### FACTS

20.     In the early morning hours of October 29, 2020, Amber Marcotte died of a fentanyl overdose while she was housed in the Sonoma County Main Adult Detention Facility ("the Jail").

21.     Ms. Marcotte's cellmate Tiffany Pimentel also overdosed on fentanyl that night. Ms. Pimentel survived.

22.     At about 4:30 a.m., guards found Ms. Pimentel outside of her and Ms. Marcotte's jail cell. She was in distress and the jail staff called an ambulance. A short time later, guards found Ms. Marcotte in her cell, deceased. She had died of what the Napa County Coroner found to be "acute fentanyl intoxication." The medical staff at the hospital where Ms. Pimentel was treated found she had also overdosed on fentanyl.

23.     Approximately four hours after finding Ms. Marcotte in her cell, the Sonoma County Sheriff's Department requested the assistance of the Napa County Sheriff to conduct a coroner's investigation of the cause of death.

24.     Although Ms. Marcotte and Ms. Pimentel both overdosed on fentanyl, Jail staff and investigators found no drugs or drug paraphernalia in their cell or on their persons.

25.     As of October 29, 2020, Ms. Marcotte and Ms. Pimentel had both been incarcerated in the Jail for an extended time. Ms. Pimentel had been in custody since September 2020, when her pretrial release was terminated by the Superior Court. Ms. Marcotte had been in Jail since July 11, 2020, following an arrest for driving under the influence.

26.     The cell Ms. Pimentel and Ms. Marcotte shared at the Sonoma County Detention Center, cell 18 in the "D Pod" on the second floor of the Jail, was locked at night and cannot be opened without the assistance of a guard. Security cameras inside the pod would also capture anyone entering or leaving Ms. Marcotte's cell at any time.

27.     Ms. Marcotte and Ms. Pimentel would have required assistance to gain access to fentanyl inside the Jail. In the several years preceding Ms. Marcotte's death, there were numerous incidents of narcotics possession inside jail facilities operated by Sonoma County and the Sonoma County Sheriff's Department.

**COMPLAINT**
**Case No.**

28.     Neither Ms. Marcotte nor Ms. Pimentel had significant funds in their jail accounts at the time they acquired fentanyl inside the Jail.

29.     On October 29, 2020, and for months prior, the Jail was closed to outside visitors because of the COVID-19 pandemic. The fentanyl that killed Ms. Marcotte must have entered the Jail through someone who had access to the interior of the Jail, which at the time could have only been a Sonoma County employee or contractor.

30.     Sonoma County has a growing problem with opioid abuse and addiction. During the pandemic, annual opioid overdose deaths more than doubled according to a Sonoma County Coroner's report.

31.     This includes inside the Jail, where in 2020, approximately 40% of inmates suffered from either mental health or substance abuse issues.

32.     According to the Sonoma County Mental Health Board, the Jail is often referred to as "the largest provider of mental health services in the county." This includes substance abuse treatment.

33.     Despite its outsized role in the County's opioid epidemic, the Sonoma County Sheriff knowingly failed to implement sufficient security practices concerning narcotics interdiction in the Jail.

34.     Sonoma County employs an outside contractor to provide its mental health and substance abuse treatment in the Jail. At the time of her death, Ms. Marcotte was participating in the substance abuse treatment programs available in the Jail. The County and the Sheriff's Department were therefore aware that Ms. Marcotte, like many inmates in the Jail, had substance abuse issues and was vulnerable to the presence of narcotics inside the Jail.

35.     The County and Sheriff Department's policy of knowingly providing insufficient security and drug interdiction measures at the Jail puts inmates in danger of relapse, overdose, and - as in the case of Ms. Marcotte - death.

36.     The Jail negligently allows employees to bring drug contraband onto the premises. This policy also puts inmates in danger of relapse, overdose, and – as in the case of Ms. Marcotte – death.

COMPLAINT
CASE NO.

37.     The Sonoma County Sheriff's Department has adopted a "Critical Incident Protocol" developed by the Sonoma County Chief's Association. A true copy of the Critical Incident Protocol is attached hereto as Exhibit A (the "Protocol")

38.     Sonoma County Sheriff's Office Policy 305.1 states that the Sheriff's Department "will follow the procedures and guidelines set forth in the Sonoma County Chief's Association Policy 93-1: Employee Involved Critical Incident Protocol." (Exhibit B.) The Protocol defines a critical incident as any incident involving "[f]atal injury while a person is in law enforcement custody which includes suicide and/or ingestion of toxic substances, or any unexplained death …" (Exhibit A at 3.) The Protocol further mandates that "Fatal injury, while in the custodial facilities of the Sonoma County Sheriff's Office, will be investigated by the Sheriff's Office Violent Crimes Unit. The Sheriff's Office Violent Crimes Supervisor shall contact the on-call Sonoma County District Attorney's Investigator and advise them of the in custody fatal injury. The D.A. Investigator will determine if the District Attorney's Office should assist with the investigation. Depending upon the circumstances, the Sheriff's Office may request that another Sheriff's Office be the lead agency or assist in the investigation. However, an independent pathologist/Coroner's Office shall be requested to conduct the Coroner's investigation in any fatal injury occurring within the custodial facilities of the Sonoma County Sheriff's Office. (1) The District Attorney's Office will review any investigation wherein they responded or assisted." (Exhibit A at 3.) Invocation of the Protocol is "mandatory," as the protocol provides that "[w]hen a Law Enforcement Employee-Involved Critical Incident occurs, the criminal investigative provisions of this Protocol *shall* be immediately invoked by member agencies to ensure that the employer agency, or the venue agency if the necessary investigative resources are not available, does not lead or have overall responsibility for the criminal investigation." (Exhibit A at 5 [emphasis added].)

39.     Even though Sonoma County Sheriff's officers found Ms. Marcotte and Ms. Pimentel had overdosed inside the Jail and had to have known that the most likely way Ms. Marcotte and Ms. Pimentel could have obtained the deadly drugs was from a person employed or

1  supervised by the Sheriff's Department, the Sheriff's Department did not invoke the Critical

2  Incident Protocol.

3        40.      On September 23, 2021, an Assistant District Attorney for Sonoma County

4  informed undersigned counsel that the Sheriff's Department "rarely" invokes the Protocol when

5  there is a death inside the Sonoma County Jail. In the case of Ms. Marcotte's death, the Sonoma

6  County Sheriff's Department did not refer the investigation of how the fentanyl Ms. Marcotte and

7  Ms. Pimentel ingested arrived in the Jail to any outside agency. Instead, the Sheriff's Department

8  oversaw the investigation of its own officers and staff.

9        41.      The County and Sheriff's Department's policy of knowingly failing to ensure

10  thorough an effective investigation of incidents of narcotics trafficking and possession in the Jail

11  put Ms. Marcotte in danger of overdose and death.

12        42.      Ms. Marcotte's death was devastating to her family. In the late morning of October

13  29, 2020, the Sonoma Sheriff's Department called and informed Ms. Marcotte's father, Michael

14  Marcotte, that his daughter had died in the Jail. Later that day, Mr. Marcotte committed suicide by

15  jumping off the Carquinez Bridge in Vallejo, California.

16        43.      Ms. Marcotte was survived by her daughter, M.M., who was nearly three years old

17  at the time. Ms. Marcotte and her father were also survived by her adult brother James. Ms.

18  Marcotte had close relationships with both her daughter and brother. Though she was incarcerated

19  and under lockdown inside the Jail, Ms. Marcotte talked to her daughter nearly every day, either

20  through video visits or phone calls. Prior to her arrest and incarceration, Ms. Marcotte and her

21  daughter had been living with Michael Marcotte, Ms. Marcotte's father who committed suicide

22  upon learning of his daughter's death. James also had a close relationship with his father, sister and

23  niece

24        44.      Counsel for Ms. Marcotte's family filed timely claims pursuant to the California

25  Tort Claims Act on April 27, 2021. Following the filing of those claims, the Marcotte family's

26  counsel engaged in discussions with the Sonoma County Counsel, the Sonoma District Attorney,

27  and private counsel for the County.

28

**COMPLAINT**
**CASE NO.**

45.     The Sonoma County District Attorney, County Counsel's office, and private counsel for the County presented several differing descriptions of the investigation into Ms. Marcotte's death. At various times between the filing of the Tort Claims Act claims and September 23, 2021, Ms. Marcotte's counsel were told there was no pending investigation by the District Attorney, that there was a pending investigation by the District Attorney, that the District Attorney had three suspects they were considering charging, and that the District Attorney was not considering charging anyone.

46.     On September 23, 2021, a representative of the District Attorney informed Ms. Marcotte's counsel that on June 29, 2021, the Sheriff's Department submitted investigation reports to the District Attorney for review. Following that review, the District Attorney referred the matter back for the Sheriff's Department for "additional investigation." On September 3, 2021, the Sheriff's Department submitted its additional investigation the District Attorney. The investigation involved "three suspects." Ms. Marcotte's family has been provided no further information about the investigation.

47.     The County's outside counsel informed undersigned counsel that the County would provide information about the status of its investigation. Outside counsel did not provide any information beyond what counsel for Ms. Marcotte already knew: that the Napa Coroner had investigated the cause of death.

48.     Counsel for Ms. Marcotte's family also contacted the Sonoma County Independent Office of Law Enforcement Review and Outreach ("IOLERO") to seek information concerning the status of the Sheriff Department's investigation. The IOLERO was established by a Sonoma County ballot measure in 2016. However, as the IOLERO itself notes, "Sonoma County Ordinance No. 6174 specifies that IOLERO is 100% 'subject to the Sheriff's collaboration.' (Ordinance No. 6174, 2-394(e)). The only power given to IOLERO is the authority to objectively audit the Sheriff Department's internal affairs investigations and make recommendations that the Sheriff's Department is free to adopt or not adopt. IOLERO does not have the legal authority to release the audits to the public." The IOLERO was unable to provide Ms. Marcotte's family with any additional information about the investigation.

49.     Though undersigned counsel made numerous requests to the Sonoma Sheriff's Department, the Sonoma District Attorney and outside counsel for the County, counsel has received no additional information as to what lead to Ms. Marcotte's death. Ms. Marcotte's counsel have not been provided copies of any Sonoma County law enforcement reports concerning the investigation of Ms. Marcotte's death, nor have they been informed of any substantive developments in the investigation.

50.     At the time of her overdose inside the Jail, Ms. Pimentel was facing numerous felony charges in Sonoma Superior Court case number SCR-738352-1. On November 2, 2020, three days after her overdose inside the Jail, Ms. Pimentel was granted probation on her pending felony case and sentenced to time served. Since she was admitted to probation, Ms. Pimentel has been arrested at least four times for possession of or being under the influence of narcotics. She has not been taken into custody and, despite several failures to appear, on October 14, 2021, Ms. Pimentel's numerous warrants were all recalled.

51.     On October 15, 2021, Ms. Marcotte's counsel spoke with court-appointed counsel for Ms. Pimentel and asked to interview Ms. Pimentel. Shortly thereafter, Ms. Pimentel's counsel declined.

52.     Counsel for Ms. Marcotte's family has delivered to the Sonoma Sheriff's Department and Sonoma County Board of Supervisors requests for disclosure and preservation of extensive categories of evidence concerning Ms. Marcotte's death. Copies of those disclosure demands are attached here as Exhibit C. The County has not disclosed any of the materials requested, though County Counsel has assured counsel for Ms. Marcotte's family that the materials have been preserved.

53.     The Sonoma County Sheriff's Department has a practice of destroying evidence related to deaths and medical incidents that take place inside the Jail. For example, the Sheriff's Department destroyed video of Nino Bosco's suicide inside Sonoma County Jail in 2019.

54.     The Sonoma County Sheriff's Department has a practice of failing to invoke applicable County policy concerning "critical incidents" inside the Jail or requesting that outside agencies lead the investigations of such incidents. The Sheriff's Department does so to avoid

1   investigation of incidents inside the Jail by outside law enforcement agencies, including the

2   Sonoma County District Attorney.

3        55.    The Sonoma County District Attorney has declined to provide any information to

4   Ms. Marcotte's family in violation of Marsy's Law, California Constitution article I, § 28, section

5   (b). In doing so, the County has intentionally violated the Marcotte family's rights under the State

6   Constitution.

7        56.    Plaintiffs have exhausted all available administrative remedies and are now forced

8   to bring the instant action.

9                              **<u>FIRST CAUSE OF ACTION</u>**

10           **Violation of Civil Rights – 42 U.S.C. § 1983 – Failure to Intervene**

11                              **(Against All Defendants)**

12       57.    Plaintiffs repeat and re-allege paragraphs 1 through 56 hereof as though fully set

13   forth herein.

14       58.    Defendants, while acting under color of law, deprived Ms. Marcotte of her civil

15   rights under the Fourteenth Amendment to the United States Constitution when they acted with

16   deliberate indifference and reckless disregard toward Decedent's right to be afforded due process

17   of law, made an intentional decision with respect to the conditions under which Decedent was

18   confined and failed to intervene by, among other things, the following acts:

19       (a)       Failing to provide security procedures and/or personnel screening

20   procedures sufficient to interdict the delivery of narcotics into the County's detention facilities;

21       (b)       Failing to provide proper oversight of the Sonoma County Sheriff's

22   Department's investigation of criminal incidents inside the County's detention facilities;

23       (c)       Failing to ensure that criminal incidents that take place inside Sonoma

24   County's detention facilities are properly investigated by law enforcement agencies that are not

25   conflicted by the possible involvement of the agency's employees or contract staff; and

26       (d)       Failing to properly monitor or watch the interior of the Jail or otherwise

27   failing to protect Decedent, or otherwise standing by and allowing Decedent to acquire narcotics

28   and overdose.

59.     Plaintiffs are informed and believed that Defendants were aware of how dangerous it was for Decedent to be placed in custody in a facility in which she had access to fentanyl or other narcotics.  Defendants intentionally, recklessly, and with deliberate indifference, failed to take any security measures to protect a vulnerable detainee and failed to employ proper security procedures and policies and ensure proper safety checks and monitoring of inmates and Jail staff.

60.     The above acts and omissions, while carried out under color of law, have no justification or excuse in law, and instead constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the course of protecting persons or property, or ensuring civil order. The above acts and omissions were consciously chosen from among other various alternatives.

61.     As a direct result of Defendants' acts and omissions onto Amber Marcotte, Plaintiffs have suffered the loss of love, care, comfort, society, companionship, assistance, protection, affection, and support of Decedents Amber Marcotte and Michael Marcotte.

62.     As a direct result of Defendants' acts and omissions onto the Decedent, Decedent experienced severe pain and suffering and the loss of life for which Plaintiffs are entitled to recover damages.

63.     Plaintiffs M.M., through her court-appointed Guardian, and James Clark bring this claim both as a successors-in-interest to Decedent and individually under the Fourteenth Amendment, in that Defendants denied Plaintiffs' rights without due process of law, and Defendants deprived Plaintiffs of their rights to a familial relationship in such a manner as to shock the conscience. Plaintiffs seek survival damages, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as wrongful death damages under this claim. Plaintiffs also seek attorneys' fees.

**SECOND CAUSE OF ACTION**

**Violation of Civil Rights – 42 U.S.C. § 1983 – Unconstitutional Custom, Practice or Policy**

**(Against All Defendants)**

64.     Plaintiffs repeat and re-allege paragraphs 1 through 63 hereof as though fully set forth herein.

65.     Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, Defendants Sonoma County, Sonoma County Board of Supervisors and Sonoma County Sheriff's Department, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Decedent and Plaintiffs, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied, among others, the following practices, policies and customs:

(a)     Failing to ensure safety of inmates, especially those that might be vulnerable, particularly by failing to provide adequate inmate safety and drug interdiction measures in the Jail;

(b)     Failing to maintain monitoring/surveillance of cells, dormitories, and dayrooms, in a manner capable of alerting personnel who could respond to security threats inside the Jail;

(c)     Failing to establish policies and procedures to reduce the risk of inmate injury by accessing narcotics inside detention facilities; and

(d)     Failing to sufficiently investigate and/or supervise the Sheriff's Department's investigations of crimes occurring inside the Jail.

66.     By reason of the aforementioned policies and practices of Defendants, Plaintiffs experienced severe pain and suffering as a result of the loss of Decedent's life, for which they are entitled to recover damages. The aforementioned acts and omissions also caused Decedent's pain and suffering, loss of enjoyment of life, and death.

67.     Defendants, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above. Despite having knowledge as stated above, Defendants condoned, tolerated,

and through actions and inactions ratified such policies and practices. Said defendants also acted with deliberate indifference to both the foreseeable effects and consequences of these policies and practices and to the constitutional rights of Plaintiffs and other individuals similarly situated. Furthermore, the policies, practices, and customs implemented, maintained and still tolerated by Defendants were affirmatively linked to and were a significantly influential force behind Plaintiffs' injuries.

68.     Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Decedent and will continue to be so deprived for the remainder of their natural lives. Plaintiff M.M., through her Guardian, and James Clark bring this claim both as a successors-in-interest to Decedent Amber Marcotte, and individually under the Fourteenth Amendment, in that Defendants denied Plaintiffs' rights without due process of law. Plaintiffs seek survival damages, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as wrongful death damages under this claim. Plaintiffs also seeks attorneys' fees.

## THIRD CAUSE OF ACTION

### Violation of Civil Rights – 42 U.S.C. § 1983 – Inadequate Training/Policy of Inaction

### (Against All Defendants)

69.     Plaintiffs repeat and re-allege paragraphs 1 through 68 hereof as though fully set forth herein.

70.     At all times mentioned herein and prior thereto, Defendants had a duty to train, instruct, supervise, and discipline their subordinates to assure they respected and did not violate the constitutional and statutory rights of inmates, and to objectively investigate violations of detainees' rights, including, but not limited to the right to be safe and protected from injury in Defendants' custody, under the Fourteenth Amendments to the U.S. Constitution.

71.     On information and belief, Defendants facilitated, permitted, ratified and condoned similar acts of inmate abuse and were deliberately indifferent to the health and safety of the inmates in general and Decedent Amber Marcotte in particular. Defendants knew, or should have reasonably known, of this practice, pattern or policy of constitutional violations, and additionally,

of the existence of facts and situations which created the potential of unconstitutional acts, and had a duty to instruct, train, supervise and discipline their subordinates to prevent similar acts to other persons, but failed to do so. In particular, the Defendants maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied, among others, the following policies, practices and customs:

(a)     Failing to adequately train, supervise, and control custodians of jail inmates in the proper recognition of narcotics trafficking activity inside the Sonoma County Main Detention Facility;

(b)     Failing to adequately train, supervise, and control custodians of Jail inmates in properly monitoring, deterring, controlling and responding to trafficking of narcotics in the Jail;

(c)     Failing to adequately train, supervise, and control custodians of jail inmates in the proper response to dangerous situations; and

(d)     Failing to maintain video monitoring/surveillance of inmate areas, such as cellblocks, pods, common areas and cells to ensure safety of inmates.

72.     As a result, Decedent Amber Marcotte sustained the injuries and damages alleged herein, Decedent's rights under the Fourteenth Amendment, and Plaintiffs' rights under the Fourteenth Amendment were violated.

73.     By reason of the aforementioned acts and omissions, Plaintiffs have been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Decedent Amber Marcotte, and will continue to be so deprived for the remainder of their natural lives. The aforementioned acts and omissions also caused Decedent's pain and suffering, loss of enjoyment of life, and death.

74.     Accordingly, Defendants each are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

75.     Plaintiffs M.M., through her Guardian, and James Clark bring this claim both as a successors-in-interest to Decedent Amber Marcotte, and individually under the Fourteenth Amendment, in that Defendants denied Plaintiffs' rights without due process of law.

76.     Plaintiffs seek survival damages, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as wrongful death damages under this claim. Plaintiffs also seek attorneys' fees.

## FOURTH CAUSE OF ACTION

### Conspiracy to Violate Civil Rights – 42 U.S.C. § 1983

### (Against All Defendants)

77.     Plaintiffs repeat and re-allege paragraphs 1 through 76 hereof as though fully set forth herein.

78.     This cause of action arises under United States Code, Title 42, Sections 1983, 1985, and 1988, wherein Plaintiffs seek to redress a deprivation under color of law of a right, privilege or immunity secured by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

79.     Defendants:

(a)     had a joint and simultaneous duty to make sure that pre-trial detainee Decedent was physically safe while in Defendants' custody;

(b)     had joint and simultaneous knowledge that Decedent was at risk due to the availability of narcotics inside the Sonoma County Main Detention Facility;

(c)     with such duty, knowledge and a meeting of the minds, took action at the same time and in the same place to collaborate to refuse to protect Decedent; and

(d)     acted as described herein above, in conspiracy with, and with the agreement permission, ratification, and approval of, each other to violate Decedent's and Plaintiffs' civil rights as stated herein.

80.     As a direct and proximate result of the aforementioned acts, omissions and deliberate indifference of each of the defendants, Plaintiffs and Decedent were harmed.

81.     Plaintiffs M.M., through her Guardian, and James Clark bring this claim both as a successors-in-interest to Decedent, and individually under the Fourteenth Amendment, in that Defendants denied Plaintiffs' rights without due process of law.

82.     Plaintiffs seek survival damages, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as wrongful death damages under this claim. Plaintiffs also seek attorneys' fees.

**FIFTH CAUSE OF ACTION**

**Monell Claim – 42 U.S.C. § 1983**

**(Against Entity Defendants)**

83.     Plaintiffs repeat and re-allege paragraphs 1 through 82 hereof as though fully set forth herein.

84.     The policies and practices of Sonoma County, Sonoma County Board of Supervisors and the Sonoma County Sheriff (hereinafter referred to collectively as the "Entity Defendants") relating to Jail security and investigation of crimes occurring within the Jail, or the deliberate failure to enforce applicable policies, allowed narcotics trafficking in the Jail facility to persist for years. Furthermore, the Entity Defendants encouraged a culture of lawlessness among Sheriff's Department personnel and staff at the Jail by failing to supervise Sheriff's officers and Jail staff and allowing them to commit acts of misconduct without discipline, as well as failing to investigate misconduct by officers and staff, volunteers, and all others granted access to the Jail by the Sheriff's Department.  This behavior was known to the Entity Defendants and tolerated for years.  The same culture of lawlessness among officers assigned to the Jail and Jail staff is a product of the Entity Defendants' custom, policy and/or practice of failing to train, supervise, investigate and/or discipline their agents and employees regarding constitutionally proper security procedures at the Jail.

85.     Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, Entity Defendants, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Decedent and Plaintiffs, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied, among others, the following practices, policies and customs:

(a)     Failing to ensure the safety of inmates, especially those that might be vulnerable to narcotics use, by failing to conduct adequate security procedures at the Jail;

16

(b)      Failing to adequately train, supervise, and control custodians of Jail inmates in the proper recognition of narcotics trafficking activity inside the Jail;

(c)      Failing to maintain video monitoring/surveillance of inmate areas, such as cellblocks, pods, common areas, cells to ensure safety of inmates; and

(d)      Failing to ensure proper investigation of incidents of narcotics trafficking and other crimes inside the Jail, particularly by allowing the Sheriff's Department to investigate its own officers and employees and failing to require the Sheriff to invoke the Critical Incident Protocol and thereby ensure oversight of investigations by outside law enforcement agencies.

86.      By reason of the aforementioned policies and practices of Entity Defendants, Plaintiffs experienced severe pain and suffering as a result of the loss of Decedent's life, for which Plaintiffs are entitled to recover damages. The aforementioned acts and omissions also caused Decedent's pain and suffering, loss of enjoyment of life, and death.

87.      Entity Defendants, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above. Despite having knowledge as stated above, Entity Defendants condoned, tolerated, and through actions and inactions ratified such policies. Said defendants also acted with deliberate indifference to both the foreseeable effects and consequences of these policies and to the constitutional rights of Plaintiffs, and other individuals similarly situated.  Furthermore, the policies, practices, and customs implemented, maintained and still tolerated by Entity Defendants were affirmatively linked to and were a significantly influential force behind Plaintiffs' injuries.

88.      Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Decedent, and will continue to be so deprived for the remainder of their natural lives.  Plaintiffs M.M., through her Guardian, and James Clark bring this claim both as a successor-in-interest to Decedent, and individually under the Fourteenth Amendment, in that Defendants denied this constitutional right without due process of law. Plaintiffs seek survival damages, including for the nature and extent of Decedent's injuries, pre-

17

death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as

wrongful death damages under this claim. Plaintiffs also seek attorneys' fees.

### SIXTH CAUSE OF ACTION

**Negligence - Cal. Civil Code 1714, Cal. Gov. Code § 844.6(d)**

**(Against All Defendants)**

89.     Plaintiffs repeat and re-allege paragraphs 1 through 88 hereof as though fully set forth herein.

90.     Amber Marcotte died as a result of a fentanyl overdose while she was confined in the Jail. She obtained the fentanyl that caused her death through either an employee or contractor of the Sonoma County Sheriff's Department.

91.     Defendants had a duty to act reasonably to avoid, or foresee the risk that Decedent was at risk of physical harm and a duty to prevent harm to Decedent as a detainee.

92.     Defendants, agents, servants, and/or employees of the Entity Defendants, and within the course and scope of such agency, service, and/or employment, and under color of authority, were negligent in relation to Decedent's health, safety and welfare, and breached their duty of care by not acting reasonably under the circumstances of such risk, as described herein /or by failing to discharge their duties.  Each of these Defendants' breaches of duty were proximate and actual causes of injury to Decedent.

93.     As a result, Decedent was injured and died.  Each of the Defendants were the proximate and actual cause of injury to Plaintiff.

94.     As a direct and proximate result of the aforementioned acts by Defendants, Plaintiffs have been and continue to be generally and specially damaged in an amount according to proof.

### SEVENTH CAUSE OF ACTION

**Negligent Infliction of Emotional Distress**

**(Against All Defendants)**

95.     Plaintiffs repeat and re-allege paragraphs 1 through 94 hereof as though fully set forth herein.

96.     Defendants had a duty to act reasonably to avoid, or foresee the risk that Decedent was at risk of physical harm and a duty to prevent harm to Decedent as a detainee.

97.     Defendants, agents, servants, and/or employees of the Entity Defendants, and within the course and scope of such agency, service, and/or employment, and under color of authority, were negligent in relation to Decedent's health, safety and welfare, and breached their duty of care by not acting reasonably under the circumstances of such risk, as described herein and/or by failing to discharge their duties.  Each of these Defendants' breaches of duty were proximate and actual causes of injury to Decedent.

98.     Upon learning the news of Decedent's death, Michael Marcotte committed suicide.

99.     At all times herein mentioned, Defendants were so negligent and careless in relation to Decedent that as a direct and proximate result thereof Mr. Marcotte was caused to and did suffer severe emotional distress as a direct result of the loss of his daughter, culminating in his own death.

100.    As a direct and proximate result of the aforementioned acts and omissions on the part of Defendants, Plaintiffs have suffered and continue to suffer from emotional distress.

101.    Said conduct on the part of the Defendants would have caused a reasonable person to suffer substantial emotional and physical distress.

102.    As a direct and proximate result of the aforementioned acts by Defendants, Plaintiffs have been and continue to be generally and specially damaged in an amount according to proof.

**EIGHTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

**(Against All Defendants)**

103.    Plaintiffs repeat and re-allege paragraphs 1 through 102 hereof as though fully set forth herein.

104.    Defendants had a duty to act reasonably to avoid, or foresee the risk that Decedent was at risk of physical harm and a duty to prevent harm to Decedent as a detainee.

**COMPLAINT**
**CASE NO.**

105.     Defendants, agents, servants, and/or employees of the Entity Defendants, and within the course and scope of such agency, service, and/or employment, and under color of authority, acted outrageously and with reckless disregard to the probability that Plaintiffs would suffer emotional distress. Further, Defendants acted outrageously and recklessly in relation to Decedent's health, safety and welfare.  Defendants breached their duty of care with their reckless and outrageous behavior, especially given the risks, as described herein. In so doing, Defendants breached their duty of care by not acting reasonable under the circumstances of such risk and/or by failing to discharge their duties.  Each of these Defendants' breaches of duty were proximate and actual causes of injury to Decedent, and to Plaintiffs.

106.     Upon learning the news of Decedent's death, Michael Marcotte committed suicide.

107.     At all times herein mentioned, Defendants were so outrageous and reckless in relation to Decedent that as a direct and proximate result thereof Mr. Marcotte was caused to and did suffer severe emotional distress as a direct result of the loss of his daughter, culminating in his own death. Defendants' conduct was a substantial factor in causing Mr. Marcotte's emotional distress.

108.     As a direct and proximate result of the aforementioned acts and omissions on the part of Defendants, Plaintiffs have suffered and continue to suffer from severe emotional distress. Defendants' conduct was a substantial factor in Plaintiffs' severe emotional distress.

109.     Said conduct on the part of the Defendants would have caused a reasonable person to suffer severe emotional and physical distress.

110.     As a direct and proximate result of the aforementioned acts by Defendants, Plaintiffs have been and continue to be generally and specially damaged in an amount according to proof.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows against Defendants:

1.     General and Special damages, including both survival and wrongful death damages, in an amount according to proof;

1         2.     Exemplary and punitive damages against each individual and Doe

2 defendant, but not against the Entity Defendants, in amounts according to proof;

3         3.     Cost of suit, including attorneys' fees, under 42 U.S.C. § 1988; and

4         4.     such other and further relief as the Court deems just and proper.

5 **JURY DEMAND**

6 Plaintiffs demand a trial by jury for all issues so triable.

7

8 DATED:  December 8, 2021         GLENN AGRE BERGMAN & FUENTES LLP

9

10         By:_____

11         Lyn R. Agre (Cal. Bar No. 178218)
        Edward E. Shapiro (Cal. Bar No. 326182)

12         44 Montgomery Street, Floor 41
        San Francisco, CA 94104

13         Telephone: (332) 233-5784
        lagre@glennagre.com

14         eshapiro@glennagre.com

15         Elizabeth Grossman (Cal. Bar. No. 104483)
        Law Offices of Elizabeth Grossman

16         1010 Grayson St.
        Berkeley, CA 94710

17         Telephone: (510) 548-5106
        office@elizabethgrossmanlaw.com

18

19         *Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28

21

# EXHIBIT A



# *SONOMA COUNTY LAW ENFORCEMENT CHIEFS' ASSOCIATION*

PROTOCOL:    **93-1**
ADOPTED:    02/19/93
REVISED:    07/1996
11/1998
06/2004
02/2005
09/2005
04/2007
01/2009
09/2010
09/2015
06/2016
10/2019

SUBJECT:    LAW ENFORCEMENT EMPLOYEE-INVOLVED CRITICAL INCIDENT PROTOCOL - *(FORMERLY ENTITLED OFFICER INVOLVED CRITICAL INCIDENT PROTOCOL)*

PURPOSE:    The purpose of this Protocol is to set forth procedures and guidelines used by Sonoma County law enforcement agencies in the criminal investigation of specifically defined incidents involving law enforcement employees.  While this Protocol represents the understanding and agreement among Member Agencies about how Law Enforcement Employee-Involved Critical Incidents are to be investigated, this Protocol is neither a statute, ordinance nor regulation. Members expect that its provisions will be followed when Protocol incidents occur but it is anticipated that agencies may make minor modifications, which will not affect the Protocol's basic principles, to meet agency requirements. It is the intention of SCLECA membership that best practices have been incorporated into this protocol, including those gleaned from the guidelines of the International Association of Chiefs of Police (IACP) Police Psychological Services Section in 2013**.** All Sonoma County law enforcement agencies are encouraged to carefully review the guidelines ratified by the IACP, share these guidelines with all their respective personnel and consider all recommended procedures prior to, during and after a law enforcement employee-involved critical incident.

I.   DEFINITIONS

    A.   <u>Actor:</u>

        1.   A person whose action is actually or conceivably a proximate cause of death, or serious bodily injury to another person or themselves; or

        2.   A person who intends an action to be the cause of serious bodily injury to a second party but the second party is actually injured or killed by another person.

        3.   An actor may be a law enforcement employee or may be a private citizen.

    B.   <u>Administrative Investigation</u>:  The investigation conducted by the employer agency arising from a specific incident(s) that determines whether or not an employee has violated employer agency rules, regulations or conditions of employment.

    C.   <u>Criminal Investigation</u>: The investigation conducted by personnel from member agencies which identifies facts that demonstrate whether or not violations of criminal law occurred in a specific incident.

    D.   <u>Employer Agency</u>:  The law enforcement agency from which the involved law enforcement employee is employed or affiliated. An employer agency may also be a venue agency in a specific incident.

    E.   <u>Fatal Injury</u>:  Death, or injury which is so severe that death is a likely result.

    F.   <u>Injured Person</u>:  Any person who sustains death or serious bodily injury as a result of an intentional or unintentional act of an actor in which force is used.

    G.   <u>Law Enforcement Employee</u>:

        1.   Any sworn peace officer, whether on or off-duty, and whether or not acting within or outside the scope of employment.

        2.   Any law enforcement civilian employee; on-duty, or off-duty who is acting within the scope of employment at the time of a specific incident.

        3.   Any on-duty reserve peace officer; or any off-duty reserve peace officer who is acting within the scope of employment at the time of a specific incident.

        4.   Any temporary law enforcement employee or any volunteer, whether paid or unpaid, who is on-duty or who is acting within the scope of employment at the time of a specific incident.

    H.   <u>Law Enforcement Employee-Involved Critical Incident</u>: A specific incident occurring in Sonoma County involving one or more persons, in which a law enforcement employee is involved as an actor or injured person; when a fatal

injury occurs. Examples of such specific incidents may include the following:

1.  Intentional and unintentional shootings.

2.  Use of any dangerous or deadly weapons (e.g., firearms, knives, clubs, etc.).

3.  Assaults upon sworn peace officers; assaults upon other law enforcement employees who are on duty or acting within the scope of employment.

4.  Attempts by law enforcement employees, within the scope of employment, to make arrests or to otherwise gain physical control of a person.

5.  Acts of physical violence in which a law enforcement employee is acting as a private citizen.

6.  A law enforcement employee suicide.

7.  Fatal injury while a person is in law enforcement custody which includes suicide and/or ingestion of toxic substances, or any unexplained death, but excludes the death of a person who dies as the result of a diagnosed disease or physical condition for which the person was receiving physician's treatment prior to death and a physician has agreed to sign the death certificate.

    a.  Fatal injury, while in the custodial facilities of the Sonoma County Sheriff's Office, will be investigated by the Sheriff's Office Violent Crimes Unit.  The Sheriff's Office Violent Crimes Supervisor shall contact the on-call Sonoma County District Attorney's Investigator and advise them of the in custody fatal injury.  The D.A. Investigator will determine if the District Attorney's Office should assist with the investigation. Depending upon the circumstances, the Sheriff's Office may request that another Sheriff's Office be the lead agency or assist in the investigation. However, an independent pathologist/Coroner's Office shall be requested to conduct the Coroner's investigation in any fatal injury occurring within the custodial facilities of the Sonoma County Sheriff's Office.

        (1)  The District Attorney's Office will review any investigation wherein they responded or assisted.

    b.  Fatal injury, while in custody at the Juvenile Justice Center shall be investigated by the Santa Rosa Police Department. Fatal injury, while in custody at the Sonoma County Juvenile Probation Camp shall be investigated by the Sonoma County Sheriff's Office.

8.  Fatal injury to a person who is a passenger of an on-duty law enforcement employee (e.g., ride-along, emergency transport, etc.).

9.  Vehicular collisions with fatal injury including those involving a law enforcement pursuit, except the following:

    a.  Collisions involving off-duty, civilian law enforcement employees who are not at the time of the collision acting for an actual or apparent law enforcement purpose.

    b.  Single vehicle collisions, not involving a law-enforcement pursuit, in which the injury is sustained by a law enforcement employee who was the driver and sole occupant of a vehicle which was not involved in a collision with any other person or occupied vehicle.

10.  This protocol may be invoked at the discretion of the Chief of Police, the Sheriff, or Chief Probation Officer of the member agency for other employee involved incidents, which result in a significant use of force or a significant injury.

I.  <u>Lead Agency</u>

The investigative agency charged with overall responsibility for supervising, coordinating and conducting the criminal investigation of a Law Enforcement Employee-Involved Critical Incident. The Petaluma Police Department, Santa Rosa Police Department, or the Sonoma County Sheriff's Office can be a lead agency.  When the proximate cause of death or injury is a vehicle collision, the Venue or Lead Agency may, depending on the circumstances and complexity of the investigation, seek the assistance of the California Highway Patrol. Also, the CHP is not precluded from being the lead agency in such cases. (See I. H. 9.)  If extraordinary circumstances exist, the District Attorney's Office is not precluded from being the lead agency.

As a matter of routine, the employer agency will not directly participate in the criminal investigation.  However, if no other agency is available to assume the lead agency role, the employer agency, with the consent of the venue agency, may elect to be the lead agency.  Additionally, if the member agencies are unable to provide sufficient staffing for the criminal investigation team, the employer agency can provide investigators to participate as members of the investigation team.  Also, when deemed necessary and appropriate, investigators from member agencies who are experienced and trained, may be invited to join the Lead Agency investigation team, whether or not the investigator is employed by the Lead Agency. (See section III, 4 d.)  Any fatal or severe injury collision involving on-duty CHP employees occurring within any jurisdiction will be investigated by the CHP Golden Gate Division Multi-disciplinary Accident Investigation Team (MAIT) in conjunction with the venue agency

J.  <u>Member Agency</u>

Any Sonoma County law enforcement agency which is a signatory to this Protocol.

K.  <u>Proximate Cause</u>

A cause which, in a natural and continuous sequence, produces death or fatal injury, without which cause the death or fatal injury would not have occurred.

L.   Venue Agency

The law enforcement agency, or agencies, within whose primary geographical jurisdiction a specific incident occurs.

II.   INVOKING PROTOCOL PROVISIONS

A.   Mandatory Invoking

When a Law Enforcement Employee-Involved Critical Incident occurs, the criminal investigative provisions of this Protocol shall be immediately invoked by member agencies to ensure that the employer agency, or the venue agency if the necessary investigative resources are not available, does not lead or have overall responsibility for the criminal investigation.

B.   Participation of Member Agencies

1.   Member agencies shall participate and cooperate in Protocol provisions relevant to mandatory invoking. Should a member agency be unable to fulfill its responsibility in the mandatory invoking process due to lack of necessary personnel resources, or other articulable reason, such information shall be immediately relayed to the member agency requesting assistance.

2.   In the event that the criminal investigative provisions of this Protocol are invoked, but necessary resources from member agencies are not sufficient to provide a lead agency to conduct the criminal investigation, or where an issue arises as to which agency should be the lead agency, the department heads of the employer agency and venue agency should consult with the Sonoma County District Attorney to discuss how to best proceed under the given circumstances. A request for investigative support may then be made to other appropriate local, state, or federal criminal investigative agencies.

C.   Notification of Agencies

1.   When a Law Enforcement Employee-Involved Critical Incident occurs and the criminal investigative provisions of the Protocol are invoked, the venue agency notifies the following agencies and/or persons as promptly as possible:

a.   Intra-departmental staff as required by that agency's internal procedures.

b.   The employer agency, if not the venue agency.

c.   The requested lead agency.

III.    INVESTIGATIVE PROVISIONS AND RESPONSIBILITIES

A.    <u>Criminal Investigation</u>

1.    **Intent**

The purpose of the criminal investigation is to establish the presence or absence of criminal liability on the part of those persons involved in the incident. The criminal investigation has investigative priority over an administrative investigation and begins immediately after the Law Enforcement Employee-Involved Critical Incident occurred. The investigation follows the rules of law which apply to criminal proceedings and focuses upon objectively identifying and documenting all relevant information about the Law Enforcement Employee-Involved Critical Incident.

2.    **Participants**

The criminal investigation is conducted by supervisors, criminal investigators and evidence technicians from member agencies in accordance with section #I, sub-section I, above.

a.    A Deputy District Attorney is assigned to provide legal support to the criminal investigator.

b.    A District Attorney Investigator is assigned to assist the deputy district attorney and provide liaison with the Office of the District Attorney.

c.    The employer agency should assign staff personnel to liaison with the lead agency.  The role of the liaison is to facilitate the investigation.  The assigned liaison(s) shall not be involved in the questioning of witnesses, evidence gathering, or any aspect of the criminal investigation. The employer agency liaison responsibility can include coordinating the flow of information between agencies and facilitating access to records information, personnel and facilities.

3.    **Venue Agency**

The employer agency makes a determination at the time of a Law Enforcement Employee-Involved Critical Incident as to which member agency will be requested to be the lead agency regardless of venue.

a.    The request for a member agency to be the lead agency, and the acceptance by that member agency to be the lead agency, is made by command staff, or an identified designee, of the respective member agencies.

b.    Within the provisions of section #I, sub-section I, above, the venue agency may also be the lead agency.

c.      When a Law Enforcement Employee-Involved Critical Incident occurs in part in two or more jurisdictions, on the boundary of two jurisdictions or at a location where the boundary is not readily ascertainable or is in dispute; the venue agency is the member agency which has the predominant law enforcement involvement in the incident and/or the majority of acts related to the fatality occur in its jurisdiction.

d.      For criminal incidents occurring on state property not otherwise under the primary jurisdiction of a state law enforcement agency, i.e., Sonoma State University, State Parks, etc., the CHP is the venue agency, e.g. the State building at 50 'D' Street, Santa Rosa; DMV offices in Santa Rosa and Petaluma, etc. The CHP may request investigative assistance from other law enforcement agencies. For criminal incidents occurring on Sonoma State University, Sonoma State University Police Services is the venue agency. For criminal incidents occurring on the property of the Santa Rosa Community College District, the Sonoma County Junior College District Police Department is the venue agency.

e.      Law Enforcement Memorandum of Understandings between two agencies that transfer venue authority from one to the other shall be honored.

f.      For incidents involving vehicular collisions occurring in areas not within the primary jurisdiction of the CHP, the CHP may be requested to provide investigative assistance to the lead agency.

4.   **Lead Agency**

Pursuant to its responsibility to supervise, conduct and coordinate the criminal investigation, the lead agency does the following:

a.      Contacts the on-call District Attorney Investigator to advise them of the fatal injury investigation and/or request assistance from the District Attorney's Office.

b.      Upon confirmation of a death, notifies the Coroner's Office and other member agencies as necessary.

(1)      If the employee agency is the Sonoma County Sheriff's Office, the Sonoma County Coroner's office will notify and request an independent pathologist/Coroner's Office to conduct the Coroner's investigation.

c.      Assigns a supervisor to manage the overall criminal investigation and has a supervisor respond to the field incident within two hours of notification. The supervisor is of the rank

of a sergeant or above, has supervised a sworn investigative unit, and has attended the following training programs:

    (1)    Officer Involved Shootings Investigation

    (2)    Homicide Investigation

    (3)    Internal Affairs Investigations

d.    Assigns a minimum of two criminal investigators to investigate the case and has them respond to the field incident within two hours of notification. Additionally, all lead agency criminal investigators shall have a minimum of five years sworn experience and be, or have been, a specifically designated investigator. A lead case investigator is designated who shall have attended the following training programs:

    (1)    Officer Involved Shooting Investigations

    (2)    Interview and Interrogation Techniques

    (3)    Homicide Investigations

Traffic collision investigators are exempt from the requirement (3) above but shall have Advanced Accident Investigation at a minimum.

e.    Obtains the assistance of sworn criminal investigators from other member agencies as needed excluding employer agency staff whenever possible. All member agency investigators assigned to assist the lead agency have a minimum of five years sworn experience and are, or have been, specifically designated detectives. These investigators work with and under the direction of the lead agency supervisor during the course of the criminal investigation.

f.    Assigns a trained evidence technician or crime scene investigator to collect, preserve, process, and document evidence. The technician/investigator is or has been employed as an evidence technician/crime scene investigator and has successfully completed a POST-certified crime scene investigation training program.

g.    Is responsible for documentation of the scene and for the collection, preservation and analysis of physical evidence. The lead agency may further request the assistance of experienced evidence collection personnel from other member agencies and/or the California Department of Justice when deemed necessary.

    (1)    Lead agency investigators will give advance notice to the employer agency when the crime scene is expected to be released from criminal investigative processing. Administrative investigators may conduct independent

crime scene processing activities once criminal investigators have completed their tasks.

(2) Evidentiary items are maintained by the lead agency until such time as otherwise directed by the Office of the District Attorney, court order, statute, or mutual agreement between the lead and venue agency. These items are made available for appropriate review in a timely manner to those member agencies with an identified interest in the investigation. The lead agency disposes of evidentiary items in accordance with law and shall notify other involved member agencies prior to final disposition of evidence or other property.

h. Is responsible for ensuring that all criminal investigators write full, complete and objective reports documenting their investigative activities. The lead agency also has the responsibility to collect relevant reports from other member agencies, maintain all documentation in accordance with statutory guidelines and submit all relevant documentation and information to the Office of the District Attorney upon completion of the lead agency investigation.  The lead agency should make every reasonable effort to complete their investigation within 90 days. The primary objective shall be to conduct a thorough and complete criminal investigation. Accordingly, depending on the unique circumstances involved, some investigations may require more than 90 days to complete.  Subsequent supplemental information will be submitted upon completion and approval.

i. Is responsible, unless otherwise agreed upon by the lead and employer agencies, for providing news media releases of information directly relevant to the criminal investigation for a period of a minimum of 72 hours following occurrence of the incident. Public statements regarding criminal investigative information shall only be made by the lead agency until such time as otherwise agreed upon by involved member agencies. The lead agency does not comment upon the administrative or employer-employee issues that are the responsibility of the employer agency.

Refer to Section IV of this Protocol for further guidelines.

j. Is responsible for conducting a full briefing for District Attorney staff, employer agency staff and other relevant member agency staff having a "right to know." The briefing is conducted at a time when the criminal investigation is not yet submitted to the Office of the District Attorney for full review, but is at a stage of completion where involved member agencies provide critical analysis to ensure all investigative concerns have been satisfactorily addressed.

5.    **Crime Scene Procedures and Security**

Emergency life saving measures have first priority in any incident and are attended to immediately by providing first aid and summoning medical support personnel when safe to do so. Supervisors and investigators need be sensitive to the possibility that involved employee(s) may have been exposed to bodily fluids during life saving measures and/or sometime during the incident. Every effort should be made to photograph employees in what they were wearing at the time of the incident. However, no employee should be kept from having bodily fluids cleaned off of them or from removing contaminated clothing to reduce the possibility of exposure to communicable diseases if a camera is not immediately available. Additionally, any employee(s) exposed to bodily fluid will not be kept from seeking medical attention as part of their agency's blood exposure protocol.

a.    When an injured person is transported to a hospital, an uninvolved law enforcement officer should accompany the person in order to:

(1)    Locate, preserve, safeguard, and maintain the chain of physical evidence.

(2)    Obtain information as permitted by law, including dying declarations.

(3)    Dependent on medical condition, maintain custody if the person has been arrested.

(4)    Provide information to medical personnel about the incident as relevant to treatment, and obtain information from medical personnel relevant to the investigation.

(5)    Identify relevant people, including witnesses and medical personnel.

(6)    Be available for contacts with the injured person's family, if appropriate.

b.    Each involved law enforcement agency is responsible for securing and protecting crime scenes. The venue agency assumes responsibility that includes preservation of the integrity of the scene(s) and its contents, access, control, and the identification and sequestration of witnesses. The venue agency maintains these responsibilities unless and/or until it is relieved by the lead agency.

(1)    A secure perimeter is established ensuring that personal safety is protected and evidence is appropriately preserved.

(2)     Access to the crime scene is strictly limited to those law enforcement and other authorized officials who have a right or recognized lawful need to be there for a life saving or investigative purpose.

(3)     A written log is established as quickly as possible to identify persons entering/exiting the scene, their purpose for entry, and the times of entry/exit.

(4)     Evidentiary items shall not be removed from the scene or manipulated without the approval of the criminal investigators or unless necessary for safety reasons or preservation of evidence.

c.     If a weapon or instrument was used in the incident, the on-scene supervisor ensures that the weapon is protected and/or collected as follows:

(1)     If the scene is secure, loose weapons or instruments are left in place until collected and processed by investigators.

(2)     If the scene is not secure, the on-scene supervisor directs whether or not a weapon or instrument is left in place. If the weapon or instrument is moved for protection, in-place photographs are taken before movement, if possible, and the initial location of the item is marked.

(3)     If an involved officer has personal possession of a firearm discharged in the incident, the on-scene supervisor (uninvolved in the firearm's discharge) shall assign an uninvolved officer to guard the involved officer. The guarding officer shall have the responsibility of providing security for the involved officer. The guard shall make certain that the involved officer's weapon, gear, and person remain undisturbed for the purpose of evidence collection or photographically documented by a member of the criminal investigation team, which may include processing for trace evidence, i.e., swabs, particulate matter, etc.  Should the involved officer's person, uniform or gear contain bodily fluids or any other bio hazard substance, the on-scene supervisor shall have the contaminated objects removed from the officer immediately and collected and preserved as evidence. Involved officers' weapons are to remain holstered (or if already upholstered, secured as found) and not to be handled by non-investigating members unless issues of officer safety exist. The above procedures may be adjusted if exigent circumstances exist (i.e., safety,

weather, inability to secure scene, etc.). The firearm, ammunition and, if applicable, duty belt will be secured by a criminal investigation team member, adhering to chain of custody procedures. Secondary or back-up firearms in the possession of an involved officer will also be taken and secured as detailed above. When the firearm is removed from the involved officer, a supervisor from the employer agency shall consider providing a like firearm to the involved officer.

(4)     Allow for the option to release non-critical equipment, personal property (safety equipment, wallets, keys, identification, etc.) after being photographed.

(5)     The on-scene supervisor shall make a full account of all firearms that were present when the incident occurred. The on-scene supervisor shall confirm that all firearms and personally possessed magazines that are believed to be uninvolved (not fired) are fully loaded. If any apparently uninvolved officer is in possession of a weapon(s) or magazines that are not fully loaded, the on-scene supervisor shall place a guard on this officer, in accordance with the manner stated in paragraph (3), above. All firearms that were present at the time of the occurrence shall be examined by a member of the criminal investigative team to determine if they have been fired. All firearms that were discharged shall be identified and collected. If a back-up weapon clearly has not been fired, or played any role in the incident, then the firearm may be photographically documented and released.  If the supervisor is an actor or injured person, the responsibility for security of weapons or instruments then rests with an uninvolved supervisor or senior uninvolved officer.

d.     Any other physical evidence at the scene which is at risk of contamination, destruction, or removal is observed, recorded and protected for collection. At risk evidence requiring immediate and special care includes gunshot residues on involved persons, blood stains, footprints, fingerprints, and volatile substance, etc.

6.     **Interviewing Non-Law Enforcement Witnesses**

Sequestered witnesses, excluding witnesses who are taken into custody or lawful detention, shall not be unnecessarily deprived of any freedom of movement. All reasonable efforts should be made to gain and retain their patience and cooperation.

7. **Interviewing Law Enforcement Employees**

Law enforcement employees are protected by the same constitutional provisions as are all citizens. As Law Enforcement Employee-Involved Critical Incident Protocol investigations are criminal investigations, criminal case law provisions (Miranda, et al) are followed whenever lawfully required.

a. Law enforcement employees are treated as witnesses or victims unless factual circumstances dictate they be treated otherwise.

b. Law enforcement employees may consult with a representative prior to interview and have the representative present during the interview.

   (1) The contents of private conversations between the representative and the law enforcement employee may not be privileged absent statutory authority, i.e., doctor, attorney, psychotherapist, etc.

   (2) The representative is allowed to privately consult about the facts of the incident with only one law enforcement employee at a time.

   (3) The lead agency investigator(s) may wish to conduct a walk-through of the crime scene with the actor(s). When deciding whether or not to conduct a walk-through, the lead agency investigator(s) should consider the emotional state of the actor(s), the possible contamination of the crime scene and the timeliness of the walk-through. The actor(s) shall not be compelled to participate in the walk-through.

   (4) An Employee-Involved Critical Incident is one of the most stressful and time-consuming incidents an officer may encounter. The emotional and physiological effects of an event of this magnitude will often be taxing on all involved parties. Care should be taken to weigh the need to obtain an immediate statement with the need to maintain the involved officers' well-being. While it is always a good idea to obtain a statement immediately following the incident, there may be times when allowing one or all of the involved officers to obtain sleep and sustenance prior to the interview is warranted.

   If circumstances dictate that interviews of the involved officers be conducted at a later time, that decision should be a collaborative one between the involved officer, his/her counsel and the Lead Agency investigators. "Reasonable preparation" with the

involved officer's counsel shall be permitted and each case should be evaluated on a case-by-case basis with all parties equally informed as to the necessity and gravity of this action, prior to the final decision being made.  Officers may be allowed up to a 48-hour sleep cycle prior to interviewing to ensure the most accurate statement can be obtained. Length of time between the incident and the interview may vary based upon the circumstances.  Officers who are allowed to provide interview information at a later time based on the event circumstances or conditions used to invoke this decision, should be advised not to discuss the circumstances of the case with anyone or subject themselves to sources of information that would alter their understanding or perception of the incident.

(5)     During the interview of the involved officer(s), investigators may elect to use a pre-designated questionnaire as part of their approach to obtain basic information before beginning direct questions about the specific actions of the officer(s). The questionnaire shall be consistent with all Member Agencies.

c.     California Government Code Section 3300 et seq (Public Safety Officers Procedural Bill of Rights) does <u>not</u> apply to:

(1)     A law enforcement employee who is not a peace officer; or

(2)     A law enforcement employee being interviewed by someone other than their employer; or

(3)     A law enforcement employee being interviewed for a criminal investigation that is <u>solely</u> and <u>directly</u> concerned with alleged criminal activities.

d.     The criminal investigators are not accompanied by staff from the employer agency during interviews with employer agency employees.

e.     To ensure proof of voluntary statements in a non-custodial interview, the criminal investigators should advise the interviewee that:

(1)     The interviewee is not in custody and is free to leave at any time.

(2)     The interviewee is not obligated to answer any questions asked by the investigators.

(i)     In the event the interviewee elects to refuse to provide a voluntary statement, all questioning shall cease. However, if there is a public safety

emergency, further questions may be
compelled of the interviewee.

f.      Law enforcement employees present at the scene when the
        incident occurs, whether as actors or witnesses, are relieved of
        their duties as soon as is safe and practical. First priority for
        relief is for an actor(s), who is then driven to the police station
        or other secure location by a supervisor or designated
        uninvolved law enforcement officer. Other involved
        employees drive or are transported to their own station or
        other agreed upon secure location. Sworn personnel not
        involved in the incident are assigned to accompany the
        involved employees.

g.      Evidence collection needs regarding involved employees are
        accomplished prior to the employee engaging in any activity
        that may destroy evidence.

h.      An uninvolved sequestering officer remains with the involved
        employees until relieved by a supervisor. The sequestering
        officer ensures the involved employees are appropriately
        situated, and the integrity of each employee's later statements
        to investigators is not tainted by group or outside discussion.
        The sequestering officer is not present during confidential
        (privileged) conversations between the employee and any
        designated representative(s). The sequestering officer has an
        affirmative obligation to report information relevant to the
        criminal investigation to the lead agency.

i.      Viewing of video and audible recording:  Officers shall be
        allowed to view any video or audio recordings captured by
        them prior to being interviewed.  Care should be given not to
        allow the involved officer(s) to view any video or hear any
        audio recordings captured on any device other than their own
        prior to the interview by the Lead Agency investigators.
        However, if requested, the involved officer's legal counsel
        may be allowed to view such recordings prior to the initial
        interview.  After the initial interview with the involved
        officer, and with the concurrence of the officer's legal
        counsel, the officer may view or hear any collected
        recordings, prior to any follow up interview.

        (1)     The following admonition should be provided to
                Involved Law Enforcement Employees prior to
                viewing any audio/visual recordings:

                i.      In this case there is audio/video evidence that you
                        will have an opportunity to view after you have
                        given your initial statement.  Video evidence has
                        limitations and may depict the events differently
                        than you recall, and may not depict all of the

events as seen or heard by you.  Video has a limited field of view and may not capture events normally seen by the human eye.  The "frame rate" of video may limit the camera's ability to capture movements normally seen by the human eye.  Lighting as seen on the video may be different than what is seen by the human eye.  Videos are a two-dimensional medium and may not capture depth, distance or positional orientation as well as the human eye.  Remember, the video evidence is intended to assist your memory and ensure that your initial statement explains your state of mind at the time of the incident.

ii.   You should not feel in any way compelled or obligated to explain any difference in what you remember and acted upon from what viewing the additional evidence provides you.  If listening to audio recordings or viewing video recordings provides additional clarity to what you remember that is fine; if it doesn't, that's fine too.

j.   All interviews are conducted separately and are audio recorded.

8.   **Intoxicant Testing**

a.   The rules of criminal law apply to intoxicant testing in a Law Enforcement Employee-Involved Critical Incident investigation. As standard procedure, all actors are requested to voluntarily submit to a blood test to determine if intoxicants are present.

b.   The request for a voluntary blood sample shall be made by the investigator from the lead agency during the collection of evidence from the officer.

c.   If an actor elects not to voluntarily submit to intoxicant testing and when investigators determine that an actor's state of potential impairment is relevant to the investigation, the following options are available when lawfully permissible:

(1)   Obtain the test sample incidental to valid arrest; or,

(2)   Obtain a search warrant.

9.   **Autopsy**

a.   Prior to any post-mortem examination, the autopsy pathologist receives a briefing on all relevant case information from investigators representing the lead agency.

b.   At least one investigator from the lead agency and one from the Office of the District Attorney attend the autopsy.

10. **Office of the District Attorney**

    a.    The Office of the District Attorney has the following responsibilities in the investigative process:

        (1)    Participate with the lead agency in conducting the investigation.

        (2)    Provide advice and direction to the investigators on relevant criminal law issues.

        (3)    Upon receipt of the investigation from the Lead Agency, analyze the facts of the incident in light of relevant statutes to determine whether or not violations of criminal law are believed to have occurred. The Office of the District Attorney will make every reasonable effort to prepare a summary report within ninety (90) days of receiving the completed investigation with the recognition that additional investigation and/or receipt of autopsy findings may result in a delay of the summary report beyond the ninety day goal.  The Lead Agency shall be given the opportunity to review the District Attorney's summary prior to its dissemination.

        (4)    As deemed appropriate, prosecute those persons believed to have violated criminal law.

        (5)    Provide the Deputy District Attorney's summary of the incident and recommendation to the Foreperson on the Sonoma County Grand Jury.

        (6)    Upon request, present investigative information to the Sonoma County Grand Jury for their consideration and review.

    b.    The Office of the District Attorney has investigative authority independent of that of other member agencies. When deemed appropriate by the District Attorney, the Office of the District Attorney may perform an independent investigation separate from the lead agency.

11. **Report Writing and Dissemination of Reports**

    a.    Law enforcement employees who witnessed or were involved in the occurrence (or who have specific information related to the occurrence) shall not write a report in most instances. Instead these individuals shall be interviewed by a member(s) of the criminal investigative team. Law enforcement employees who are involved in conducting the criminal investigation shall prepare a report that fully documents their investigation. Law enforcement employees who are not a part of the criminal investigation team, but who assist in the

furtherance of the investigation (i.e., scene security, transportation of witnesses, etc.) shall document their involvement in a report. All original reports shall be forwarded to the lead agency's supervising investigator for review and approval. Once approved, the reports shall be retained by the lead agency as part of the cumulative investigative report. A copy of any approved report may be retained by the employing agency of the report writer, if desired. The immediate supervisor of the criminal investigation is authorized to request a written report from any law enforcement employee, including management, if it is deemed to be in the best interest of the criminal investigation.

b. Documentation of any Body Worn Camera (BWC) footage, video footage, surveillance footage etc.. should be written in summary form. Information such as camera view, lighting, video quality and the existence of such evidence should be documented, however Investigators should use caution in interpreting video as it may leave out other information not captured in a two-dimensional video. The video evidence should be presented and interpreted based on the information available and interpreted by the audience it is intended for.

c. It is the responsibility of each involved agency to direct the necessary writing of reports by their employees. Reports should be written and distributed to the lead agency within 72 hours of actions taken or investigated.

d. The lead agency has the ultimate responsibility to ensure that reports are collected from other agencies.

e. Upon completion of the lead agency investigation, the Lead Agency shall provide copies of the entire case to the District Attorney's Office, and the Employer Agency. Once the District Attorney has completed their review and issued a finding, the District Attorney will provide a complete copy to the Sonoma County Civil Grand Jury. In the event that additional case work is performed after submission of the case to the above parties, it shall be the responsibility of the Lead Agency to provide subsequent reports or investigation documentation to the above entities.

B. ADMINISTRATIVE INVESTIGATION

1. **Intent**

An administrative investigation is an investigation conducted by the employer agency for the purposes of:

a. Determining whether or not an employee violated rules, regulations or conditions of employment of the employer agency.

b.    Determining the adequacy of employer agency policies, procedures, training, equipment, personnel and supervision. Nothing in this Protocol prohibits the employer agency from compelling a statement during the course of an administrative investigation. Prior to taking a compelled statement, every effort shall be made to consult with the District Attorney to ensure the criminal investigation is not compromised.

2.    **Responsibility**

Whether or not an administrative investigation is conducted is the concern and responsibility solely of the employer agency.

a.    The criminal investigation conducted by the lead agency is always given investigative priority over an administrative investigation. It is intended that this prioritization will minimize conflict between the two investigations and it will prevent the criminal investigation from being compromised by an untimely exercise of employer agency administrative action.

3.    **Disclosure**

Interview statements, physical evidence, toxicology test results and investigative leads which are obtained by administrative investigators when ordering law enforcement employees to cooperate shall not be revealed to criminal investigators unless clear legal authority exists and then only when directed by the District Attorney. Results of the administrative investigation may or may not be privileged from disclosure to others, depending upon applicable law.

4.    **Investigator**

The employer agency may assign an administrative investigator to conduct independent administrative investigative activities.

a.    An administrative investigator has access privilege to briefings, crime scenes, physical evidence and interviewees' statements in the criminal investigation. The administrative investigator does not accompany the criminal investigator during interviews.

5.    **Intoxicant Testing**

a.    Intoxicant test results obtained in the criminal investigation are available for use in an administrative investigation.

b.    In the event the criminal investigation does not obtain samples for intoxicant testing or the employer agency wishes its own independent samples, the employer agency may seek samples following the criminal investigator's intoxicant testing actions by:

(1)    Obtaining valid consent from the employee; or,

(2) When lawfully permissible, ordering the employee to provide samples based upon an employment relationship.

IV. RELEASE OF INFORMATION TO THE NEWS MEDIA

    A. <u>General Information</u>

        1. The community's interest to know what occurred in a Law Enforcement Employee-Involved Critical Incident must be balanced with investigative responsibilities and the rights of involved individuals. In all cases, the information released to the public and manner in which it is released by member agencies is in accordance with legal mandates.

            a. Member agencies ensure that intentionally misleading, erroneous, or false statements are not made.

            b. Only those individuals with appropriate knowledge and member agency approval should make public statements regarding an incident.

            c. Member agencies communicate directly with each other to ensure information releases and community statements do not jeopardize the integrity of the criminal investigation.

    B. <u>Lead Agency</u>

        1. Unless otherwise agreed upon by the lead and employer agencies, the lead agency is responsible for providing news media releases of information directly relevant to the criminal investigation.

        2. Release of criminal investigative information, including public statements about the investigation, is only done under the guidance and/or approval of the lead agency until such time as otherwise agreed upon by involved member agencies.

        3. The lead agency does not comment upon the employer-employee issues that are the responsibility of the employer agency.

    C. <u>Employer Agency</u>

        1. The employer agency is responsible for providing news media release of information directly relevant to the employer-employee relationship, including the status of any administrative investigation.

        2. The employer agency may prepare the initial press release involving the incident. The press release will be confined to the following areas:

            a. The initial statement about what occurred.

            b. An employee of the employer agency was involved.

            c. The Sonoma County Law Enforcement Employee-Involved Critical Incident Protocol has been invoked.

            d. The identification of the lead and participating agencies.

       e.      The employment status of the involved employee(s).

   3.     The employer agency should coordinate the release of any employer-employee information so that it does not conflict with criminal investigative concerns.

   4.     The employer agency may make statements or issue press releases regarding the criminal investigation when approved by the lead agency as long as it does not conflict with a criminal investigation or concern.

  D.    <u>Office of the District Attorney</u>

   1.     The Office of the District Attorney is responsible for providing news media release of information directly relevant to the District Attorney's statutory authority. News media releases regarding investigative findings and any subsequent prosecution based upon the criminal investigation are the responsibility of the Office of the District Attorney.

E.      SB 1421/AB 748

It is the responsibility of the employer agency to release body worn camera footage and audio files directly related to the critical incident, or use of force resulting in great bodily injury, as required by Assembly Bill 748. The lead investigative agency will be responsible for redacting and releasing all investigative reports generated as part of the investigation and shall be released under the guidelines established in Senate Bill 1421.

V.     REPORTING IN-CUSTODY DEATH

    Pursuant to Government Code Section 12525, each law enforcement agency in which a person dies while in their custody, shall report, in writing to the Attorney General, within 10 days after the death, all facts concerning the death.  Deaths occurring in the Sonoma County Jail shall be reported to the Attorney General by the Sonoma County Detention Division per policy entitled "Emergencies – Inmate Death."

# EXHIBIT B

Policy
**305**

Sonoma County Sheriff's Office
Policies

# Officer-Involved Shootings and Deaths

### 305.1   POLICY
The Sonoma County Sheriff's Office will follow the procedures and guidelines set forth in the Sonoma County Chief's Association Policy 93-1: Employee Involved Critical Incident Protocol.

See attachment: 93-1 Critical Incident Protocol 10-03-19.pdf

Copyright Lexipol, LLC 2021/10/19, All Rights Reserved.
Published with permission by Sonoma County Sheriff's Office

# EXHIBIT C

# GLENN AGRE BERGMAN & FUENTES LLP

Lyn R. Agre
lagre@glennagre.com
44 Montgomery St., 41st Floor
San Francisco, CA 94104
(415) 358-6444

April 22, 2021

Sonoma County Sheriff
2796 Ventura Ave.
Sonoma, CA 95403
Via Email: Sheriff-CIB@sonoma-county.org.

        Re: Amber Rae Marcotte Investigation

Dear Sonoma County Sheriff:

My name is Lyn Agre and I am an attorney in San Francisco (Cal. Bar No. 178218). I, along
with attorney Elizabeth Grossman (Cal. Bar No. 104483) represent the minor child of decedent
Amber Rae Marcotte, Michaela Marcotte, in relation to potential civil litigation on the minor's
behalf. Amber Marcotte died in the Sonoma County Jail on or about October 29, 2020. It is our
understanding that the investigation of Amber Marcotte's death was assigned to your office.

On Michaela Marcotte's behalf, we hereby request that you disclose to us all Sheriff's
Department reports concerning Amber Marcotte's death (we have delivered a similar request via
your online portal). Our request includes any and all investigative reports, records, test results,
lab reports, photographs, and visual or audio media that were gathered in relation to the Sheriff's
investigation of Amber Marcotte's death.

If you require any additional information from us in order to process this request, please contact
me at (415) 358-6444, or by email at lagre@glennagre.com.

                        Regards,

                        /s/  Lyn R. Agre

                        LYN R. AGRE
                        Attorney for Michaela Marcotte



New York
San Francisco
www.glennagre.com

# GLENN AGRE BERGMAN & FUENTES LLP

Lyn R. Agre
lagre@glennagre.com
44 Montgomery St., 41st Floor
San Francisco, CA 94104
(415) 358-6444

April 27, 2021

Sonoma County Board of Supervisors
575 Administration Drive, Suite 100A
Santa Rosa, CA 95403
Via Hand Delivery

   Re: Amber Rae Marcotte

To County of Sonoma:

My name is Lyn Agre and I am an attorney in San Francisco (Cal. Bar No. 178218). I, along
with attorney Elizabeth Grossman (Cal. Bar No. 104483) represent the minor child of decedent
Amber Rae Marcotte, Michaela Marcotte, as well as Michaela Marcotte's guardian, Michelle
Saxton, in relation to potential civil litigation on the minor's behalf. Amber Marcotte died in the
Sonoma County Jail on or about October 29, 2020. It is our understanding that the County's
investigation of Amber Marcotte's death is ongoing.

Attached here please find the claim of Michaela Marcotte and Michelle Saxton, pursuant to
California Government Code section 910 et seq., for damages stemming from Amber Marcotte's
death.

If you require any additional information from us in order to process this claim, please contact
me at (415) 358-6444, or by email at lagre@glennagre.com.

Regards,

LYN R. AGRE
Attorney for Michaela Marcotte


New York
San Francisco
www.glennagre.com

# GLENN AGRE BERGMAN & FUENTES LLP

Lyn R. Agre
large@glennagre.com
44 Montgomery St., 41st Floor
San Francisco, CA 94104
(415) 358-6444

July 12, 2021

Sonoma County Counsel
575 Administration Dr., # 105A
Santa Rosa, CA 95403
(707) 565-2421

      Re: Potential Claims re Amber Marcotte

To the Sonoma County Counsel:

      We are legal counsel for Michael Marcotte and James Clark, the daughter and brother of decedent Amber Marcotte, who are seeking legal redress for the wrongful death of Ms. Marcotte in the Sonoma County Jail on October 29, 2020. As you are aware, we have previously filed a claim under the California Government Code which the County rejected.

      By this letter, we provide formal notice that Sonoma County, its employees, agents, or third-parties controlled by or affiliated with the County, are legally obligated to preserve all documents, electronically-stored information ("ESI") and other evidence related in any way to Ms. Marcotte's death, including without limitation, all documents and communications and all electronic media, such as video or audio recordings.

      As part of your document preservation obligations, you should, among other things: (a) identify all relevant custodians and ensure that all their potentially relevant documents and ESI are preserved by providing to each such custodian a proper written "litigation hold" that advises them of the legal claims on behalf of Ms. Marcotte's family and their legal obligation to preserve evidence; (b) cease auto-deletion of all potentially relevant documents and ESI; (c) preserve data-storage media that either are the sole source of potentially relevant information or that relate to relevant custodians; and (d) periodically re-issue the written litigation hold to the relevant individuals and personnel.

      At a minimum, the litigation hold should advise the custodians of the following: In the case of ESI, you should ensure that all relevant or potentially relevant emails, text messages, or other forms of electronic communication are not deleted from the custodians' electronic devices, accounts, inbox or outbox, or their personal or public folders, and that any documents, video files, or audio files saved in electronic form, wherever located be preserved. With respect to video and audio recordings, it seems apparent the County and/or the Sheriff is in possession of jail security camera footage

New York
San Francisco
www.glennagre.com

GLENN AGRE BERGMAN & FUENTES LLP

Sonoma County Counsel
July 12, 2021
Page 2 of 4

recorded in the hours surrounding Ms. Marcotte's death, and any such recordings are
required to be preserved as evidence. In the case of paper records, you should ensure that
any relevant or potentially relevant document is preserved in its current form. Custodians
should be advised that litigation hold applies not only to the County's computers and
electronic devices and accounts (such as email accounts), including but not limited to
desktops, laptops, servers or other networks, but also to personal electronic accounts and
computers, home computers, personal laptops, smart phones, cameras or other recording
devices, tablets and any other personal hand-held, mobile or home electronic device (e.g.
voice mail, etc.), including all email accounts, text messages or instant-messaging
records. The duty to preserve extends to metadata of electronic records, and you are
required to take steps to ensure that metadata, too, is not altered or destroyed. In that
regard, all emails and text messages should be (i) printed out and maintained in a hard
copy file, and (ii) saved to a folder where they will not be automatically deleted or
altered. You should ensure that no documents are destroyed, altered or modified and no
additions or changes should be made to any relevant or potentially relevant documents or
data. When in doubt about whether a particular item should be preserved, you should err
on the side of preservation.

    In particular, claimants request that the County of Sonoma take all required actions to
preserve the following materials:

    (1) All pertinent Sonoma County Jail records, including but not limited to:
        a. All video recordings of the interior of the women's jail from October 28 and 29,
           2020.
        b. All records of the jail financial accounts (or "books") of inmates Amber Marcotte
           and Tiffany Pimentel (Ms. Marcotte's cellmate).
        c. All visitor logs for inmates Amber Marcotte and Tiffany Pimentel for the period
           of October of 2020.
        d. All audio recordings of phone calls or visits involving inmates Amber Marcotte or
           Tiffany Pimentel, for the entire period of their term of incarceration.
        e. All administrative records regarding inmates Amber Marcotte and Tiffany
           Pimentel, including disciplinary actions, work assignments, medical requests,
           exams and treatment, and records of mail sent or received.
        f. All women's jail cell assignments for the date of October 28, 2020.
        g. All Sheriff and staff assignments at the women's jail for the date of October 28
           and 29, 2020.
        h. The names and schedules of all jail personnel, whether civilian or Sheriff's
           Department employees, who worked in the unit or tier or otherwise designated
           area of the women's jail where Ms. Marcotte was housed during the period of
           October 15, 2020, through October 29, 2020.
        i. All photos or video recordings of the scene of Amber Marcotte's death.

GLENN AGRE BERGMAN & FUENTES LLP

Sonoma County Counsel
July 12, 2021
Page 3 of 4

        j.  All entry and exit logs of investigators or staff who entered the scene of Ms. Marcotte's death on October 29, 2020.

        k.  All charts, diagrams, drawings, evidence logs, photos of evidence, or other reports concerning the investigation of the scene of Ms. Marcotte death.

(2) All pertinent Sonoma County Sheriff's records, including but not limited to the following:

        a.  All reports, photos, records, lab reports, recordings of witness interviews, emails, text messages, records of communications including emails and text messages, or any other relevant records or data, no matter how preserved, created during the course of the Sonoma County Sheriff's investigation of the death of Amber Marcotte;

        b.  All records of prior investigation of Sonoma County Sheriff's Department employees or jail staff who worked at or were employed by the Sonoma County Jail on October 28, 2020.

        c.  All records related to Sheriff's Department investigations of narcotics possession or trafficking at the Sonoma County Jail between May 1, 2020, and December 31, 2020.

        d.  Disciplinary complaints and records (i.e. "Pitchess materials") for all Sheriff's Department personnel who worked as the jail as of October 28, 2020, for the period of the previous five years.

        e.  All records of Sheriff's Department radio traffic and emergency dispatch records for the period of 11:00 p.m. on October 28, 2020, to 11:00 a.m. on October 29, 2020.

        f.  All records of calls for ambulance, EMT, Fire Department or paramedic service at the Sonoma County Jail on October 28 and 29, 2020.

        g.  All reports of interviews of inmates or staff at the Sonoma County Jail in relation to the investigation of Ms. Marcotte's death or drug trafficking at the jail in the year 2020.

      Nothing contained in or omitted from this letter is, or should be construed as, a limitation, restriction or waiver, express or implied, of any of our client's rights and remedies in connection with any of the matters raised herein, all of which are expressly reserved.

      You are legally required to take appropriate measures and our client is entitled to and expects your prompt compliance with this preservation demand. So that we may seek appropriate injunctive relief, if necessary, please advise us by August 2, 2021, if you will agree to take steps to preserve the above material.

                                   Regards,