1  GLENN AGRE BERGMAN & FUENTES LLP
   Lyn R. Agre (CASBN 178218)
2  Edward E. Shapiro (CASBN 326182)
   Chloe F. Rosenberg (Admitted *Pro Hac Vice*)
3  44 Montgomery Street, Floor 41
   San Francisco, CA 94104
4  Telephone: (332) 233-5784
   lagre@glennagre.com
5  eshapiro@glennagre.com
   crosenberg@glennagre.com
6
   LAW OFFICES OF ELIZABETH GROSSMAN
7  Elizabeth Grossman (CASBN 104483)
   1010 Grayson St.
8  Berkeley, CA 94710
   Telephone: (510) 548-5106
9  office@elizabethgrossmanlaw.com

10
   *Attorneys for Plaintiffs*
11

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14

15

16  MICHELLE SAXTON, as Guardian        CASE NO. 3:21-cv-09499-SI
    ad Litem for M.J., a minor; JAMES
17  CLARK; ESTATE OF AMBER              **PLAINTIFFS' OPPOSITION TO MOTION TO**
    MARCOTTE; ESTATE OF                 **DISMISS THE FIRST AMENDED**
18  MICHAEL MARCOTTE,                   **COMPLAINT**

19              Plaintiffs,             Date:  April 15, 2022
                                        Time: 10:00 a.m.
20       v.                             Dept.: Courtroom 1, 17th Floor
                                        Judge: Hon. Susan Illston
21  COUNTY OF SONOMA;
    SONOMA COUNTY BOARD OF
22  SUPERVISORS; SONOMA
    COUNTY SHERIFF'S
23  DEPARTMENT; SONOMA
    COUNTY SHERIFF MARK
24  ESSICK, DOES 1-50 inclusive,

25              Defendants.

26

27

28

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

SUMMARY OF FACTS……... ...................................................................................... 3

     A.    Amber Marcotte's Death................................................................. 3

     B.    The Jail ........................................................................................... 4

     C.    The Investigation ............................................................................ 5

     D.    What Plaintiffs Know About the Investigation ............................... 7

     E.    Aftermath to the Marcotte Family .................................................. 8

     F.    Causes of Action ............................................................................ 9

STANDARD OF REVIEW ............................................................................................ 9

ARGUMENT ................................................................................................................ 10

     A.    Defendants Ignore Relevant Facts That Create a Reasonable
Inference of Liability.................................................................... 10

     B.    Municipal Liability Exists Pursuant to *Monell* ....................... 11

     C.    Plaintiffs Allege Facts Sufficient to Hold Defendants Liable
Under Section 1983 ...................................................................... 13

     D.    All Named Defendants Are Proper ............................................... 15

     E.    Defendants Violated California Law ............................................ 15

CONCLUSION ............................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Warner*,
451 F.3d 1063 (9th Cir. 2005) ............................................... 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................. 9

*Bd. of County Com'rs of Bryan County, Okl. v. Brown*,
520 U.S. 397 (1997)............................................................ 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................. 9

*Brown v. City & Cty. of San Francisco*, No. C,
2014 WL 1364931 (N.D. Cal. Apr. 7, 2014) ............................. 16

*Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff*,
533 F.3d 780 (9th Cir. 2008) ............................................... 15

City of Canton v. Harris,
489 U.S. 378, 386 (1989)..................................................... 13

*Cortez v. Cty. of Los Angeles*,
294 F.3d 1186 (9th Cir. 2002) .............................................. 15

*Frary v. Cty. of Marin*,
81 F. Supp. 3d 811 (N.D. Cal. 2015) ...................................... 13

*Galen v. Cnty. Of L.A.*,
477 F.3d 652 (9th Cir. 2007) ............................................... 12

*Giraldo v. Dep't of Corr. & Rehab.*,
168 Cal. App. 4th 231 (2008) .......................................... 15, 17

*Harper v. City of Los Angeles*,
533 F.3d 1010 (9th Cir. 2008) .............................................. 12

*Jackson v. Barnes*,
749 F.3d 755 (9th Cir. 2014) ............................................... 14

*Johnson v. State of Cal.*,
207 F.3d 650 (9th Cir. 2000) ................................................. 9

*Kelley v. Conco Companies*,
196 Cal.App. 4th 191 (2011) ................................................ 17

ii

*Leatherman v. Tarrant Cty. Narcotics Intel. & Coordination Unit*,
    507 U.S. 163 (1993).............................................................................................. 9

*Long v. Cnty. of Los Angeles*,
    442 F.3d 1178 (9th Cir. 2006) ........................................................................... 12

*Lytle v. Carl*,
    382 F.3d 978 (9th Cir. 2004) ............................................................................. 12

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978)............................................................................................ 12

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001) ............................................................................... 9

*Oviatt v. Pearce*,
    954 F.2d 1470 (9th Cir. 1992) ........................................................................... 13

*Perez v. Van Groningen & Sons, Inc.*,
    41 Cal. 3d 962 (1986).......................................................................................... 16

*Price v. Sery*,
    513 F.3d 962 (9th Cir. 2008) ............................................................................. 12

*Trevino v. Gates*,
    99 F.3d 911 (9th Cir. 1995) ............................................................................... 12

*Tsao v. Desert Palace, Inc.* ...................................................................................... 14

*Ulrich v. City & Cnty. of San Francisco*,
    308 F.3d 968 (9th Cir. 2002) ............................................................................. 12

**Statutes**

42 U.S.C § 1983 ......................................................................................... 9, 12, 13, 14

Cal. Civ. Proc. Code § 377.60 ................................................................................. 16

Cal. Civil Code § 1714............................................................................................... 9

Cal. Gov. Code § 844.6 ........................................................................................ 9, 16

Cal. Gov. Code § 26605............................................................................................ 15

Plaintiffs' Michelle Saxton, as Guardian ad Litem for M.J., James Clark, the Estate of Amber Marcotte, and the Estate of Michael Marcotte ("Plaintiffs"), by their undersigned attorneys, respectfully submit this memorandum of law in opposition to the Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (the "Motion").

### INTRODUCTION

Defendants assert they are not liable for failing to stop drug trafficking inside the Jail they operate because they are simply powerless, or had no opportunity to intervene, to stop the flow of drugs into the jail.  The astounding implications of this argument aside, our system of government does not consider this a lawful approach to incarceration by the state. Those charged with protecting the safety on inmates cannot lawfully decide to ignore their obligations to intervene in drug trafficking in the jails simply because drug smuggling is so prevalent. Sonoma County has a growing drug problem, particularly in its jails, where approximately 40% of inmates suffer from a mental health or substance abuse disorder.  But the County has instituted policies in the Sonoma County Main Adult Detention Facility (the "Jail") that allow drugs and other contraband into the Jail, putting inmates at risk of overdose, and in the case of Amber Marcotte, death.  The County puts inmates with known addiction issues—like Ms. Marcotte—in harm's way by failing to take proper precautions to stop drugs from entering the Jail and by failing to properly investigate known instances of drug use in the Jail.  Defendants' deliberate indifference to the inadequate security policies in the Jail places inmates at grave risk and directly enabled Ms. Marcotte's untimely death.

In the nearly two years since Ms. Marcotte died in the County's custody, the County has stonewalled her family, preventing them from accessing crucial information about her death, and stopping Plaintiffs' counsel from accessing relevant information about the investigation. Defendants' tactics do not only hinder this litigation. By continuing to prevent outsiders, including other law enforcement agencies and the courts, from investigating the manner in which the Defendant's run the Sonoma County jails, Defendants exacerbate the danger that their inadequate security and oversight policies pose future inmates.

Plaintiffs' First Amended Complaint ("FAC") includes allegations of constitutional violations committed by County actors which are as detailed as they could possibly be given Defendants' insistence on withholding relevant information.  Defendants' Motion to Dismiss conveniently omits many salient facts that sufficiently plead liability of all Defendants, while failing to acknowledge it is Defendants' own refusal to provide relevant information concerning Ms. Marcotte's death that precludes Plaintiffs from alleging further factual detail.  Despite this stonewalling, the FAC makes clear that deliberate decisions and inaction by the Defendants directly led to Ms. Marcotte's untimely passing.

Defendants argue that Plaintiff's allegations are insufficient because the FAC details one example of drug smuggling in a jail system Defendants readily admit is awash in illegal narcotics. These arguments quibble with red herring factual details and fail to address Plaintiff's overarching allegations—that inmate overdoses regularly occur, that the County and Sheriff and Jail staff know that, that the Jail's policies (if they exist) do not adequately address the problem, that Jail staff are not appropriately trained or supervised as to drug interdiction, and because of all that, Ms. Marcotte overdosed and died.

As set forth herein, the Motion should be denied because the FAC plausibly pleads that Defendants failed to intervene by failing to provide sufficient security, failing to provide proper oversight, and failing to properly investigate criminal activities taking place in the Jail and violated Ms. Marcotte's civil rights by instituting unconstitutional customs, practices and policies. Moreover, as alleged in the FAC, Defendants violated Ms. Marcotte's civil rights specifically by deliberately failing to investigate incidents of drug trafficking in the Jail, inadequately training their subordinates to avoid injury to inmates, and conspiring to violate civil rights by thwarting any investigation of their combined failure to keep Ms. Marcotte safe in their custody.  In addition, all Defendants were negligent in relation to Ms. Marcotte's health, safety, and welfare

**2**

and Defendants negligently and inflicted emotional distress on Plaintiffs.

Given the above, Plaintiffs have adequately pleaded their causes of action, and the Motion should be denied.

## SUMMARY OF FACTS

Plaintiff incorporates by reference all facts alleged in the FAC, and summarizes those facts in relevant part below.

**A.    Amber Marcotte's Death**

On October 29, 2020, Amber Marcotte, an inmate at the Jail died of a fentanyl overdose (FAC at ¶ 20).  At about 4:30 A.M. on that day, guards found Ms. Marcotte's cellmate Tiffany Pimentel in distress outside of her and Ms. Marcotte's inexplicably unlocked cell. (FAC at ¶ 22). Jail staff called an ambulance, and authorities later determined that Ms. Pimentel had suffered a fentanyl overdose.  Guards then found Ms. Marcotte in her cell deceased.  *Id.*

Approximately four hours after finding Ms. Marcotte in her cell, the Sonoma County Sheriff's Department requested the assistance of the Napa County Sheriff to conduct a coroner's investigation of the cause of death (FAC at ¶ 23).  The Napa County Coroner found that Ms. Marcotte had died of "acute fentanyl intoxication."  Although both Ms. Marcotte and Ms. Pimentel had overdosed on fentanyl, Jail staff and investigators found no drugs or drug paraphernalia in their call or on their persons (FAC at ¶ 24).

Ms. Marcotte had been in Jail since July 11, 2020, following an arrest for driving under the influence (FAC at ¶ 25).  Ms. Marcotte had a known history of substance abuse.  Ms. Pimentel had been in custody since September 2020, when her pretrial release was terminated by the Superior Court.  *Id.* The cell Ms. Pimentel and Ms. Marcotte shared at the Sonoma County Detention Center, cell 18 in the "D Pod" on the second floor of the Jail, was locked at night and could not be opened without the assistance of a guard.  Security cameras inside the pod would also capture anyone entering or leaving Ms. Marcotte's cell at any time (FAC at ¶ 26).

Ms. Marcotte and Ms. Pimentel would have required assistance to gain access to fentanyl inside the Jail.  In the several years preceding Ms. Marcotte's death, there were numerous

**3**

incidents of narcotics possession inside jail facilities operated by Sonoma County and the Sonoma County Sheriff's Department.  Neither Ms. Marcotte nor Ms. Pimentel had significant funds in their jail accounts at the time they acquired fentanyl inside the Jail (FAC at ¶¶ 27-28).

**B.      The Jail**

Sonoma County has a growing problem with opioid abuse and addiction. During the pandemic, annual opioid overdose deaths more than doubled according to a Sonoma County Coroner's report.  This includes inside the Jail, where in 2020, approximately 40% of inmates suffered from either mental health or substance abuse issues.  In fact, according to the Sonoma County Mental Health Board, the Jail is often referred to as "the largest provider of mental health services in the county."  This includes substance abuse treatment (FAC at ¶¶ 30-32).

The County and Sheriff Department's policy of knowingly providing insufficient security and drug interdiction measures at the Jail puts inmates in danger of relapse, overdose, and – as in the case of Ms. Marcotte – death.  The Jail negligently allows employees, contractors and inmates to bring drug contraband onto the premises and has failed to protect known contraband entry points.  This policy also puts inmates in danger of relapse, overdose, and – as in the case of Ms. Marcotte – death (FAC at ¶ 36).

Despite its outsized role in the County's opioid epidemic, the Sonoma County Sheriff knowingly failed to implement sufficient security practices concerning narcotics interdiction in the Jail (FAC at ¶¶ 35). At the time of her death, Ms. Marcotte was participating in the substance abuse treatment programs available in the Jail.  The County and the Sheriff's Department were therefore aware that Ms. Marcotte, like many inmates in the Jail, had substance abuse issues and was vulnerable to the presence of narcotics inside the Jail.  (FAC at ¶ 34).

On October 29, 2020, and for months prior, the Jail was closed to outside visitors because of the COVID-19 pandemic.  Outsiders were not allowed to enter the Jail. It follows that the fentanyl that killed Ms. Marcotte must have entered the Jail through someone who had access to the interior of the Jail, which at the time could have only been a Sonoma County employee or contractor, or an inmate who was allowed to breach security protocols.  (FAC at ¶ 29).  And as a

result of that person's actions, and the failure of Defendants to prevent it, Ms. Marcotte died.

**C.      The Investigation**

The investigation into Ms. Marcotte's death has been a failure and demonstrates defendants' indifference towards substance abuse in the Jail. Not only have Defendants ignored set protocols governing the investigation, Defendants have also refused to share relevant information about the investigation with Plaintiffs.

The Sonoma County Sheriff's Department has adopted a "Critical Incident Protocol" developed by the Sonoma County Chief's Association.  (FAC at ¶ 37).  Sonoma County Sheriff's Office Policy 305.1 states that the Sheriff's Department "will follow the procedures and guidelines set forth in the Sonoma County Chief's Association Policy 93-1: Employee Involved Critical Incident Protocol." (FAC, Exhibit B.) The Protocol defines a critical incident as any incident involving "[f]atal injury while a person is in law enforcement custody which includes suicide and/or ingestion of toxic substances, or any unexplained death …" (FAC, Exhibit A at 3) The Protocol further mandates that "Fatal injury, while in the custodial facilities of the Sonoma County Sheriff's Office, will be investigated by the Sheriff's Office Violent Crimes Unit. The Sheriff's Office Violent Crimes Supervisor shall contact the on-call Sonoma County District Attorney's Investigator and advise them of the in custody fatal injury.  The D.A. Investigator will determine if the District Attorney's Office should assist with the investigation.  Depending upon the circumstances, the Sheriff's Office may request that another Sheriff's Office be the lead agency or assist in the investigation.  However, an independent pathologist/Coroner's Office shall be requested to conduct the Coroner's investigation in any fatal injury occurring within the custodial facilities of the Sonoma County Sheriff's Office. (1) The District Attorney's Office will review any investigation wherein they responded or assisted." (FAC, Exhibit A at 3.) Invocation of the Protocol is "mandatory," as the protocol provides that "[w]hen a Law Enforcement Employee-Involved Critical Incident occurs, the criminal investigative provisions of this Protocol *shall* be immediately invoked by member agencies to ensure that the employer agency, or the venue agency if the necessary investigative resources are not available, does not lead or have overall responsibility for the criminal investigation." (FAC, Exhibit A at 5 [emphasis added].)

5

1  (FAC at ¶ 38).

2       Even though Sonoma County Sheriff's officers found Ms. Marcotte and Ms. Pimentel had

3  overdosed inside the Jail and had to have known that the most likely way Ms. Marcotte and Ms.

4  Pimentel could have obtained the deadly drugs was from a person employed or supervised by the

5  Sheriff's Department, the Sheriff's Department did not invoke the Critical Incident Protocol

6  (FAC at ¶ 39).

7       On September 23, 2021, an Assistant District Attorney for Sonoma County informed

8  undersigned counsel that the Sheriff's Department "rarely" invokes the Protocol when there is a

9  death inside the Sonoma County Jail. In the case of Ms. Marcotte's death, the Sonoma County

10  Sheriff's Department did not refer the investigation of how the fentanyl Ms. Marcotte and Ms.

11  Pimentel ingested arrived in the Jail to any outside agency. Instead, the Sheriff's Department

12  oversaw the investigation of its own officers and staff (FAC at ¶ 40).

13       The County and Sheriff's Department's policy of knowingly failing to ensure thorough

14  and effective investigation of incidents of narcotics trafficking and possession in the Jail put Ms.

15  Marcotte and other addicted inmates in danger of overdose and death.

16       And despite their failure to invoke the Critical Incident Protocol, defendants insist that

17  they did. For instance, the Sheriff's Officer has alleged that it invoked the Critical Incident

18  Protocol by having the Napa County Coroner conduct the investigation of the cause of Ms.

19  Marcotte's death. But that does not satisfy the investigatory requirements of the protocol—the

20  Sonoma County Sheriff's Department still conducted the investigation into its own misconduct.

21  Defendants' arguments that they invoked the Protocol fly in the face of the fact that all evidence

22  indicates the Sonoma Sheriff's Department was solely responsible for the investigation of the

23  manner in which the lethal dose of fentanyl was smuggled into the jail. Again, that is not enough.

24       In addition to Defendants' numerous breaches of protocol during the investigation,

25  Defendants have been unwilling to update Ms. Marcotte's family about the investigation.

26  Defendants have continued to withhold critical information about the investigation from

27  Plaintiffs, and to the people who were closest to Ms. Marcotte, in violation of the California

28  Constitution. Given that it has now been 16 months since Ms. Marcotte's death and no charges

have been filed, it is apparent that Defendants' goal in continuing to withhold all information about their investigation to date is to stymie Plaintiffs' pursuit of this litigation. And while Plaintiffs have described some of the County and Jail policies that contributed to Ms. Marcotte's death, there undoubtedly are others that have been withheld from the public due to security concerns. As long as Plaintiffs withhold critical information about Ms. Marcotte's death— including evidence concerning security measures in place inside the Jail on the night Ms. Marcotte died—Plaintiffs will be unable to plead their case in greater detail.

**D.      What Plaintiffs Know About the Investigation**

Despite Defendants' stonewalling, Plaintiffs have been able to independently unearth some information about Ms. Marcotte's death and the ensuing investigation. On or about January 20, 2022, counsel for Plaintiffs learned from third-party witnesses that the Sonoma County Sheriff has purportedly identified three individuals the Sheriff purportedly suspected of transporting into the Jail the fentanyl Ms. Marcotte ingested. The three individuals the Sheriff's Department identified as suspects are Tiffany Pimentel, Bianca Navarro and Frankie Thompson; the investigation is assigned District Attorney's case number PBK1001856 (FAC at ¶ 41). Based on social media postings, it appears Navarro and Thompson have a romantic relationship of unknown duration. Plaintiffs are not aware of a social connection between Pimentel and either Navarro or Thompson. Amber Marcotte does not appear to have known either Navarro or Thompson (FAC at ¶ 42).

On October 30, 2020, the day following Amber Marcotte's death, Bianca Navarro was charged, in Sonoma County Superior Court case number SCR-742052-1, with possessing narcotics inside the Sonoma County Jail on October 28, 2020 (FAC at ¶ 43). On December 29, 2021, Ms. Navarro entered a plea of *nolo contendre* to the charge of possessing narcotics in the jail and was released on her own recognizance, apparently to allow her to enter a drug treatment facility in Sonoma County called "Athena House". On or about January 26, 2022, Ms. Navarro apparently absconded from the treatment facility as the Superior Court revoked her release and issued a bench warrant for her arrest (FAC at ¶ 44).

The Superior Court minute order for Ms. Navarro's change of plea hearing indicates Ms.

7

Navarro has an agreement with the Sonoma County District Attorney to "testify truthfully in case # SCY-201229006". That Sheriff's investigation number corresponds to Sonoma County Superior Court case number SCR-749624-1, *People v. Alejandro Paniagua-Martinez*. There is no apparent connection between Ms. Navarro and Mr. Paniagua-Martinez. (FAC at ¶ 45).

Frankie Thompson has numerous criminal cases pending in Sonoma County. It appears he posted bail in order to secure his release from custody but has now absconded. On January 19, 2022, Sonoma County Counsel Joshua Myers filed in several of Mr. Thompson's pending cases statements of "non-opposition" to a bail agency's "motion to extend time on appearance period" and the date for forfeiture of the bond posted to secure Thompson's release (FAC at ¶ 46).

Though the Sheriff apparently claims Ms. Pimentel is suspected of providing Amber Marcotte with the fentanyl that killed her, on November 2, 2020, the Superior Court granted Ms. Pimentel a conditional sentence and probation on her then pending felony case. Ms. Pimentel was released from custody that day (FAC at ¶ 47). Following her release on probation and a conditional sentence, Ms. Pimentel was charged in four new criminal cases (SCR-743490, SCR743908, SCR-746044 and SCR-749602) based on arrests she suffered while on release under her conditional sentence. However, Ms. Pimentel was not returned to custody. (FAC at ¶ 48).

On February 1, 2022, Ms. Pimentel appeared in Department 7 of the Sonoma County Superior Court. At the hearing, the District Attorney moved to dismiss two of Ms. Pimentel's pending drug cases. Ms. Pimentel then pleaded no contest in two of her pending misdemeanor cases: one alleging one count of possession of methamphetamine and one alleging one count of possession of fentanyl. Ms. Pimentel received a sentence of 12 months of incarceration, but the court suspended imposition of the custodial sentence. The court did not impose any fines. On the pending felony case, in which Pimentel violated her probation and conditional sentence, the court dismissed the violations and reinstated Ms. Pimentel on felony probation. (FAC at ¶ 49)

**E.    Aftermath to the Marcotte Family**

Ms. Marcotte's death was devastating to her family. She was survived by her parents, her brother James, and a daughter M.J. In the late morning of October 29, 2020, the Sonoma Sheriff's Department called and informed Ms. Marcotte's father, Michael Marcotte, that his daughter had

1   died in the Jail. Later that day, Mr. Marcotte committed suicide by jumping off the Carquinez

2   Bridge in Vallejo, California. (FAC at ¶ 52)

3       Ms. Marcotte's daughter M.J. was nearly three years old at the time. Ms. Marcotte had close

4   relationships with both her daughter and brother. Though she was incarcerated and under

5   lockdown inside the Jail, Ms. Marcotte talked to her daughter nearly every day, either through

6   video visits or phone calls. Prior to her arrest and incarceration, Ms. Marcotte and her daughter

7   had been living with Michael Marcotte, Ms. Marcotte's father who committed suicide upon

8   learning of his daughter's death. James also had a close relationship with his father, sister and

9   niece (FAC at ¶ 53).

10       Ms. Marcotte's death, the failed investigation, and Mr. Marcotte's suicide have caused

11   ongoing trauma to Ms. Marcotte's remaining family.

12   **F.      Causes of Action**

13       Plaintiffs bring this lawsuit alleging five claims for relief under 42 U.S.C § 1983, including

14   for failure to intervene; for having an unconstitutional custom, practice or policy; for inadequate

15   training and a policy of inaction; for conspiracy to violate civil rights. Additionally, Plaintiffs

16   allege one negligence claim under Cal. Civil Code 1714, Cal. Gov. Code § 844.6(d); one claim

17   for negligent infliction of emotional distress; and one claim for intentional infliction of emotional

18   distress.

19                                 **STANDARD OF REVIEW**

20       In considering Defendants' Motion, the Court must accept that "all the allegations in the

21   complaint are true (even if doubtful in fact)" and must draw all reasonable inferences in Plaintiffs'

22   favor.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Navarro v. Block*, 250 F.3d 729, 732

23   (9th Cir. 2001).  The Motion must be denied if the Complaint contains sufficient facts taken as true

24   that allow it "to draw the reasonable inference" that Defendants are liable for the alleged misconduct.

25   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  There is no "heightened pleading standard" in civil

26   rights cases alleging municipal liability under § 1983.  *See Leatherman v. Tarrant Cty. Narcotics*

27   *Intel. & Coordination Unit*, 507 U.S. 163 (1993).  To the contrary, courts have emphasized "the rule

28   of liberal construction is 'particularly important in civil rights cases.'"  *Johnson v. State of Cal.*, 207

**9**

1    F.3d 650, 653 (9th Cir. 2000).

2                                    **ARGUMENT**

3    **A.       Defendants Ignore Relevant Facts That Create a Reasonable Inference of Liability**

4              Defendants' Motion to Dismiss ignores facts crucial to this litigation, particularly

5    regarding security protocols in the Jail.  Defendants' contentions that "[d]rugs in detention

6    facilities have been commented by Courts going back to at least the 1970s…" (Motion at 6:19-

7    20); and that Plaintiffs' pleading "could be plead for any drug event in any detention facility

8    across the nation" (*id.* at 7:3-4) are factually inaccurate and misleading.[1]  By their FAC, Plaintiffs

9    plead facts sufficient to establish that the security breaches leading up to Ms. Marcotte's death are

10   so unusual as to create a reasonable inference that Defendants are liable for Ms. Marcotte's death.

11   These facts include, among many others:

12       1.  That Ms. Pimentel was discovered outside of her cell at 4:30 a.m. on the morning of Ms.

13           Marcotte's overdose, strongly suggesting that prison personnel did not adhere to or

14           consciously disregarded the Jail's security policies.  (FAC at ¶ 22).

15       2.  Ms. Marcotte died during the height of the COVID-19 pandemic.  The Jail was closed to

16           everyone but employees and contractors.  This was not like "any drug event in any

17           detention facility."  This tragic and deadly incident occurred when the Jail was entirely

18           closed off to everyone but employees on the Jail's payroll, and the inmates those

19           employees were charged with protecting.  (FAC at ¶ 29).

20       3.   COVID-19 aside, the Jail is known for having substandard security policies, particularly

21           policies that stop the smuggling of contraband into the Jail.  (FAC at ¶ 35).

22       4.  Defendants do not properly investigate their own security breaches—as evidenced by their

23           failure to properly invoke the Critical Incident Protocol.  (FAC at ¶¶ 37-40).

24             Defendants have consistently withheld investigation and incident reports about Ms.

25   Marcotte's death.  Logic dictates that those reports would include information about the

26

27   _____
     [1] Additionally, Defendants' argument is outrageous and unlawful. The mere fact that drugs are
28   available in prisons and jails does not establish how they get there and does not refute the
     assertion that guards or other staff members are involved in the smuggling of contraband.

                                              10

1    circumstances surrounding the incident, including when and how the drugs entered the Jail, as

2    well as material information about the security protocols that were breached.  This would provide

3    additional insight into the practices and policies that caused Ms. Marcotte's overdose and death.

4    At this point all that is known is that the Sheriff's Department identified Pimentel and Navarro

5    but the charges were rejected by the District Attorney.  Whatever is in the reports, we do know

6    that the District Attorney found it insufficient.  Additionally, it would provide further proof of

7    Plaintiffs' contention that it is improper to blanketly compare this incident to other drug

8    overdoses, because the security policies and practices at the Sonoma County Jail are so uniquely

9    inept, that it is incomparable.

10        Defendants imply that they could not have stopped the flow of drugs into the Jail.  While

11   such a factual dispute is beyond the Court's inquiry on a motion to dismiss, as the FAC plainly

12   alleges, at the time of Ms. Marcotte's death, the Jail was closed to everyone but inmates,

13   employees, and contractors.  Despite these strict restrictions, the Jail was unable to close off well-

14   known points of entry to contraband. Defendants have not alleged a single action they took to

15   slow the flow of contraband into the Jail.

16        Further, Defendants mischaracterize the FAC allegations concerning who smuggled the

17   fentanyl that killed Ms. Marcotte into the Jail.  Defendants claim that Plaintiffs allege three non-

18   employees smuggled the fentanyl into the Jail.  (Motion at 4:13-15.)  Not so.  To be clear,

19   Plaintiffs do not yet know who smuggled the fentanyl into the Jail.  Defendants have withheld

20   relevant investigatory materials, making it impossible for Plaintiffs to ascertain this information.

21   Plaintiffs have learned from third-party witnesses that the Sheriff's Department has sought to

22   implicate three non-employees, Ms. Pimentel, Ms. Navarro, and Mr. Thompson.  (FAC at ¶ 41.)

23   But, to the best of Plaintiffs' knowledge, the sixteen-month investigation has failed to develop

24   evidence sufficient to establish that any particular individuals were involved in smuggling the

25   drugs into the jail.

26   **B.      Municipal Liability Exists Pursuant to _Monell_**

27        This case presents an archetypical example of a government entity's deliberate indifference to

28   their obligations to enact and maintain policies that safeguard the health and safety of persons they are

charged with protecting. One does not have to examine the record to find such indifference: Defendants themselves proudly flaunt their own supposed powerlessness and offer it as justification for their own inaction.

The FAC adequately alleges municipal liability under *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690 (1978). In *Monell*, the United States Supreme Court held that municipalities are "persons" subject to liability under 42 U.S.C. § 1983. *Id.* at 658; *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). Such municipal liability may be premised on: (1) conduct pursuant to an expressly adopted official policy; (2) a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity; (3) a decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (4) an official with final policymaking authority either delegating that authority to, or ratifying the decision of, a subordinate. *See Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008); *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004); *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1995).

Upon establishing one of the above premises of liability, a plaintiff must show that the challenged municipal conduct was both the cause in fact and the proximate cause of the constitutional deprivation. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008); *Trevino*, 99 F.3d at 918. The municipality is liable if the individual can establish that the local government "had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation she suffered." *Galen v. Cnty. Of L.A.*, 477 F.3d 652, 667 (9th Cir. 2007) (quoting *Monell*, 436 U.S. at 694-695).

Here, Plaintiffs plausibly allege multiple methods of liability in the forms of Defendants' knowingly lax security protocols in the Jail, which enable contraband—including narcotics—to enter the Jail and permitted Ms. Pimentel (and possibly Ms. Marcotte) to exit their cells and roam the Jail unsupervised; and Defendants' longstanding failures to properly investigate themselves. Additionally, Defendants' policies were both the cause in fact and proximate cause of Ms. Marcotte's death.

In order to establish *Monell* liability for a municipality based on its policy, a plaintiff must show that the policy amounted to a "deliberate indifference" to her constitutional rights. *Anderson v.*

*Warner*, 451 F.3d 1063, 1070 (9th Cir. 2005).  The policy itself need not be facially invalid.  In *City of Canton v. Harris*, the Supreme Court specifically rejected the contention that § 1983 liability can be imposed on a municipality only if the municipal policy (or custom) in question is itself unconstitutional. 489 U.S. 378 (1989).  Rather, a valid custom or policy may incur § 1983 liability if it is unconstitutionally applied. *Id*. at 387.  County policies and practices also incur § 1983 liability when they are deliberately indifferent to an employee's supervision or discipline, training, or to the adoption of policies necessary to prevent constitutional violations.  *See Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 411 (1997); *Canton,* 489 U.S. at 379; *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  Deliberate indifference requires proof that a municipal actor disregarded a known or obvious consequence of his action.  *Brown,* 520 U.S. at 410.

Defendants' Motion affirms Defendants' deliberate indifference with respect to its obligations to inmates.  Defendants' blithe remarks about the persistent presence of drugs in its prison system as some exculpatory fact only serves to highlight Defendants' misguided view as to its obligations to provide adequate security and inmate safety in the Jail.  *See Frary v. Cty. of Marin*, 81 F. Supp. 3d 811, 838 (N.D. Cal. 2015) (deliberate indifference adequately demonstrated where sergeant expressed belief that deputies were not responsible for monitoring inmates).

Here, the FAC is replete with instances in which Defendants were deliberately indifferent to the impacts of its substandard security.  Defendants were deliberately indifferent of their duties and obligations to ensure, among other things, that (i) prisoners were secured in their cells (FAC at ¶ 22), (ii) narcotics were not brought into the Jail by inmates or Jail personnel (FAC at ¶ 29), and (iii) recurring drug overdoses are investigated by an outside agency pursuant to the Critical Incident Protocol (FAC at ¶ 38).  As a direct result of this deliberate indifference, Ms. Marcotte died.  On the basis of these well pleaded allegations, the FAC adequately alleges municipal *Monell* liability.

**C.**     **Plaintiffs Allege Facts Sufficient to Hold Defendants Liable Under Section 1983**

As alleged in detail in the FAC, Defendants violated Plaintiffs' civil rights under 42 U.S.C. § 1983 by (i) failing to intervene (FAC ¶¶ 68-74); (ii) maintaining unconstitutional customs, practices, and policies (FAC ¶¶ 75-79); (iii) failing to provide adequate training (FAC ¶¶ 80-87); and (iv) conspiring to violate civil rights (FAC ¶¶ 88-93).

Defendants' practices and policies, including their consistent failure to investigate crimes involving their own employees (FAC at ¶ 38), and their substandard security protocols which enable contraband like narcotics to enter the Jail (FAC at ¶ 33), led to Ms. Marcotte's overdose and untimely death in violation of 42 U.S.C. § 1983.  There are likely additional policies violative of Section 1983 that led or contributed to Ms. Marcotte's death, however, due to Defendants' refusal to provide Plaintiffs sufficient information about the circumstances of Ms. Marcotte's death or the subsequent investigation, Plaintiffs require discovery to unearth the full scope of Defendants' negligent and harmful policies.  Nonetheless, even despite Defendants' deplorable withholding, Plaintiffs pleaded sufficient known policies for this Motion to be denied.

Policies of inaction as well as policies of action can give rise to *Monell* liability.  A policy of inaction or omission may be based on the failure to implement procedural safeguards to prevent constitutional violations. *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) ("In an inaction case, the plaintiff must show, first, 'that [the] policy amounts to deliberate indifference to the plaintiff's constitutional right.'") (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012)).  A plaintiff must show that the defendant 'was on actual or constructive notice that its omission would likely result in a constitutional violation." *Tsao*, 698 F.3d at 1145. A plaintiff must also show "that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy." *Id.* at 1143 (internal quotations omitted).

Defendants could easily have adopted any number of policies to prevent Ms. Marcotte's death, including but not limited to (i) preventing inmates from roaming the Jail unsupervised; (ii) improving the Jail's security system in order prevent prisoners and/or employees from bringing contraband onto the premises, and (iii) properly investigating misconduct at the Jail in order to create a safer environment.  Defendants' failure to seek proper outside investigation—namely by ignoring the Critical Incident Protocol—is particularly harmful and likely creates an environment where guards know that intentional misconduct and negligence can go unchecked because the Jail staff will not be held accountable.

Defendants ignored numerous policies that would have protected Jail inmates—thus

14

allowing the Jail to become unsafe and dangerous, and ultimately creating an environment that enabled Ms. Marcotte's death.

**D.      All Named Defendants Are Proper**

Each defendant named in the FAC is proper and should not be dismissed.  Defendants argue that Sheriff Essick must be dismissed because he is sued in his official capacity and that he is not the real party of interest. Defendants cite *Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff*, 533 F.3d 780 (9th Cir. 2008) for the proposition that "[a]n official capacity suit against a municipal officer is equivalent to a suit against the entity." But the *Center for Bio-Ethical Reform* court clarifies that the "court may dismiss the officer as a redundant defendant." Here, the FAC makes clear that Sheriff Essick is anything but a redundant Defendant.

Plaintiffs argue that the Sonoma County Sheriff's Department should also be dismissed as defendants because they are agents of the County of Sonoma, which Defendants classify as "the real defendant of interest in this case." But "[a]s administrator of the jail, the Sheriff is responsible for developing and implementing policies pertaining to inmate housing." *Cortez v. Cty. of Los Angeles*, 294 F.3d 1186, 1190 (9th Cir. 2002); additionally, Government Code section 26605 provides that the "sheriff shall take charge of and be the sole and exclusive authority to keep the county jail and the prisoners in it."  Cal. Gov. Code § 26605.  The Sheriff's Department was responsible for Ms. Marcotte's safety and must be a party to this action.

**E.      Defendants Violated California Law**

1.      The FAC Adequately Alleges Negligence

The FAC adequately alleges Defendants' negligence, including with respect to Defendants' failure to act reasonably to avoid the risk of physical harm to Ms. Marcotte.  By their Motion, Defendants mistakenly claim that they "did not owe any duty to the Plaintiffs," (Motion at 18:28-19:1). It is well established in California that jails and prisons owe a duty of care to their inmates. *See Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 251–53 (2008) ("there is a special relationship between jailer and prisoner which imposes a duty of care on the jailer to the prisoner.")

Defendants breached that duty, creating liability for negligence, which flows to Ms. Marcotte's estate. *See* Cal. Civ. Proc. Code § 377.60:

> A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons… The decedent's… children, and issue of deceased children or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession.

Defendants claim Plaintiffs may not claim negligence under state law because "public entities cannot be held directly liable unless a specific statutory basis exists."  First, Plaintiffs are not solely claiming direct liability as Defendants claim but are also claiming liability for the acts of its employees.  *See* FAC at ¶ 103 ("Defendants, agents, servants, and/or employees of the Entity Defendants… were negligent in relation to Decedent's health, safety and welfare…").  Defendants are vicariously liable for all Jail employees who failed to fulfill their duty of care to Ms. Marcotte.  *See Perez v. Van Groningen & Sons, Inc.*, 41 Cal. 3d 962, 967 (1986) ("Under the doctrine of *respondeat superior*, an employer is vicariously liable for his employee's torts committed within the scope of the employment.").  Second, the FAC sets forth a statutory basis for Plaintiffs' liability claims.  *See* Cal. Gov. Code § 844.6(d).

Defendants argue that Cal. Gov. Code § 844.6(d) precludes Plaintiffs from bringing an action against them.  If that were true, it would only exempt entity defendants, but not Sheriff Essick, or the Doe Defendants.  *See Brown v. City & Cty. of San Francisco*, No. C 11-02162 LB, 2014 WL 1364931, at *1 (N.D. Cal. Apr. 7, 2014).  As such, at this stage, Plaintiffs require discovery to identify which individuals were involved.

Contrary to Defendants' assertion that "Plaintiffs have not identified a statute that allows liability against a public entity," Plaintiffs have cited statutory support, and have plead facts sufficient to establish that Defendants breached their duty of care to Ms. Marcotte by failing to

provide adequate security to stop deadly contraband from entering the Jail, leading to Ms.

Marcotte's overdose and death. *See Giraldo*, 168 Cal. App. 4th at 251–53.

### 2.   The FAC Adequately Alleges Infliction of Emotional Distress

Defendants inflicted emotional distress on Plaintiffs both intentionally and negligently.  In their

Motion to Dismiss, Defendants state that "Plaintiffs allege that Defendants had a duty to avoid risk of

physical harm to Michael Marcotte." (Motion at 19:3-4.)  Plaintiffs do no such thing.  Plaintiffs state that

Mr. Marcotte committed suicide the day he learned of Ms. Marcotte's death.  Plaintiffs further state that

"Defendants were so negligent and careless in relation to [Ms. Marcotte] that as a direct and proximate

result thereof, Mr. Marcotte was caused to and did suffer severe emotional distress as a direct result of

the loss of his daughter, culminating in his own death" (FAC at ¶ 52).

Defendants argue that Plaintiffs cannot show evidence that Defendants owed Plaintiffs a duty.  But

as Defendants themselves note, "a duty to the plaintiff may be 'imposed by law, be assumed by the

defendant, or exist by virtue of a special relationship.' *Potter v. Firestone Tire & Rubber Co.,* 6

Cal.4th 965, 985 (1993)." (Motion at 19:17-28.)  Defendants omit that the *Potter* court also found

that when defendant has a "duty to plaintiff in which the emotional condition of the plaintiff is an

object, recovery is available only if the emotional distress arises out of the defendant's breach of

some other legal duty and the emotional distress is proximately caused by that breach of duty."

Such is the case here.

Additionally, as Defendants acted outrageously with reckless disregard to the probability that

Plaintiffs would suffer emotional distress when it failed to take the necessary precautions to

protect and treat Amber Marcotte—a woman with a known history of substance abuse.  As

Defendants mention in their brief, "A cause of action for intentional infliction of emotional

distress exists when there is (1) extreme and outrageous conduct by the defendant with the

intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the

plaintiffs suffering severe or extreme emotional distress; and (3) actual and proximate causation

of the emotional distress by the defendant's outrageous conduct." *Kelley v. Conco Companies*,

196 Cal.App. 4th 191, 215 (2011).  Plaintiffs failed to prevent the flow of narcotics into the Jail—

**17**

even when the Jail was closed to all visitors; Plaintiffs failed to provide adequate and up to date drug treatment to inmates at the Jail; and Plaintiffs failed to properly investigate themselves when misconduct arose in the Jail. Plaintiffs' egregious failures rise to the level of intentional infliction of emotional distress.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss. Alternatively, if the Court believes Plaintiffs has not met the standards required for a constitutional claim of municipal liability, a claim of state liability, and/or has not met the pleading standards required to include the individual Defendants, Plaintiffs respectfully request they be granted leave of court to amend their complaint in compliance with the federal rules.

DATED:  March 8, 2022                    GLENN AGRE BERGMAN & FUENTES LLP

                                          By:___*/s/ Lyn R. Agre*_____
                                             Lyn R. Agre (Cal. Bar No. 178218)
                                             Edward E. Shapiro (Cal. Bar. No. 326182)
                                             Chloe F. Rosenberg (admitted *pro hac vice*)
                                             44 Montgomery Street, Floor 41
                                             San Francisco, CA 94104
                                             Telephone: (332) 233-5784
                                             lagre@glennagre.com
                                             eshapiro@glennagre.com
                                             crosenberg@glennagre.com

                                             Elizabeth Grossman (Cal. Bar. No. 104483)
                                             Law Offices of Elizabeth Grossman
                                             1010 Grayson St.
                                             Berkeley, CA 94710
                                             Telephone: (510) 548-5106
                                             office@elizabethgrossmanlaw.com

                                             *Attorneys for Plaintiffs*