1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

8

9

10

11

12

13

14

| | |
|---|---|
| MICHELLE SAXTON, as guardian ad litem for M.J., a minor; ESTATE OF AMBER MARCOTTE; KATRINA McGINNIS, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SONOMA, *et al.*, <br><br> Defendants. | Case No. 21-cv-09499-SI <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART ADMINISTRATIVE MOTIONS TO SEAL** <br><br> Re: Dkt. No. 185, 186, 190 |

15

16

17

18

19

20

On May 22, 2025, the Court held a hearing on defendants' motion for summary judgment. For the reasons set forth below, the Court GRANTS summary judgment in favor of defendants on the Saxton plaintiffs' § 1983 claims against defendant Sheriff Essick based on qualified immunity, and GRANTS summary judgment on the Estate of Amber Marcotte's negligence claims based on failure to file a tort claim. The Court DENIES the balance of defendants' motion for summary judgment, finding that there are triable issues of fact on the remaining claims.

21

22

**BACKGROUND**

23

**I.    Death of Amber Marcotte**

24

25

26

27

28

This case arises out of the death of Amber Marcotte due to a fentanyl overdose when Marcotte was an inmate at Sonoma County Main Adult Detention Facility ("MADF"). At approximately 4:26 a.m. on October 29, 2020, correctional deputies discovered Marcotte unresponsive in her cell. The deputies administered lifesaving measures, including CPR and Narcan, but those efforts were unsuccessful and Marcotte was pronounced dead at approximately

United States District Court
Northern District of California

5:02 a.m..  The cause of death was determined to be acute fentanyl intoxication.

Marcotte had been at MADF since July 10, 2020, after being arrested for violations of California Vehicle Code § 23153(f) (driving under the influence, drugs only, with injury); California Penal Code § 273(a) (child cruelty); and California Vehicle Code § 14601.2(a) (driving with a suspended license).  On September 15, 2020, Marcotte pled no contest to the DUI and child cruelty charges, and at the time of her death she was awaiting sentencing.  Marcotte had been arrested and booked into MADF approximately 15 times over the course of 10 years, including multiple arrests for drug related crimes such as possession of controlled substances, possession of controlled substance paraphernalia, and driving under the influence of alcohol and/or drugs.

An investigation by the Sonoma County Sheriff's Office revealed that Marcotte was given the fentanyl by her cellmate, Tiffany Pimentel, and that Pimentel had obtained the fentanyl from a recent arrestee, Frankie Thompson, when Pimentel was working in MADF's "book/wait" area on the afternoon of October 28, 2020.  On October 28, two individuals – Frankie Thompson and Bianca Navarro – were arrested for possession of a controlled substance (Navarro) and possession of a controlled substance paraphernalia (Thompson) and booked into MADF.  As part of the booking process, deputies administered "pat searches" to Thompson and Navarro; neither search uncovered any drugs on either Thompson or Navarro.

Starting around 1:22 p.m., Thompson and Navarro waited in the book/wait area of MADF until they were processed into MADF's housing units.  Navarro later told investigators that she and Thompson brought fentanyl and fentanyl paraphernalia into the book/wait area by concealing the drugs and paraphernalia in their genital areas.  Navarro told investigators that once she and Thompson were in the book/wait area, Thompson provided her with drugs by leaving some fentanyl in one of the restrooms.

On October 28, Pimentel worked in the book/wait area from approximately 2:15 p.m. until 6:20 p.m.  During that time, Pimentel cleaned the book/wait area, including the restrooms, and she interacted with Thompson and Navarro.  Navarro told investigators that she saw Thompson give Pimentel fentanyl in the book/wait area.  Plaintiffs state that Pimentel was able to submit two forms to transfer money out of her commissary to relatives of the arrestees to pay for her fentanyl

purchase.[1]

The Sonoma County Sheriff's Office Administrative Review states,

At the time Thompson and Navarro were in the booking waiting area of the jail, Pimentel was working as an inmate worker in the booking area. The three individuals appeared to know each other and proceeded to interact with each other over the course of approximately four hours. During this time frame, Pimentel, Thompson and Navarro individually entered the bathroom in the booking waiting area multiple times. During this time frame, all three individuals also showed symptoms of being under the influence of narcotics, specifically central nervous system depressants, as all three appeared to "nod off" or spontaneously fall asleep.

Report at 4.

According to defendants, after Pimentel finished working in the book/wait area, she was subjected to a strip search by Deputy Valderrama before she returned to her housing module. Plaintiffs dispute that Deputy Valderrama conducted a strip search, asserting that the booking area surveillance footage shows Valderrama standing in the doorway of the room where she supposedly searched Pimentel and noting that pursuant to MADF policy, strip searches are supposed to be conducted with the door closed. In any event, plaintiffs claim that if Pimentel was in fact searched in any way, the search was ineffective as demonstrated by the fact that Pimentel was able to bring fentanyl from the book/wait area into her housing module.

At approximately 10 p.m., Thompson placed fentanyl on the booking counter while he was filling out paperwork for the MADF staff. Plaintiffs claim that Thompson was in a "drug-induced stupor" when he did so. Deputies conducted a strip search of Thompson and found additional fentanyl on him. Deputies also conducted a strip search of Navarro and found pieces of tin foil containing heroin and fentanyl in one of Navarro's socks. No further investigation was conducted at that point; deputies did not review surveillance footage of the book/wait area, nor did deputies search Pimentel or her cell, despite the fact that Pimentel had spent hours with Thompson and Navarro in the book/wait area and had interacted with them multiple times during that afternoon.

On October 29, 2020, at 4:00 a.m., Pimentel was called out of her cell to work in the jail's kitchen. When she arrived at the kitchen she collapsed and/or had a seizure, and she lost

---

[1] Navarro told investigators Thompson gave Pimentel fentanyl in exchange for Pimentel releasing $200 from her MADF inmate account to Thompson's mother so his mother could bail him out.

consciousness. Medical staff were called to the kitchen and a deputy administered Narcan, and Pimentel was transferred to a hospital for treatment of a fentanyl overdose. Shortly thereafter is when a deputy discovered Marcotte unresponsive in her cell.

## II.    MADF Policies and Practices

Plaintiffs claim that MADF failed to institute and follow policies and procedures that would have prevented the fentanyl from being smuggled into the jail and thus prevented Marcotte's death from a fentanyl overdose. Citing deposition testimony as well as contemporaneous public statements, plaintiffs assert that numerous County employees, including Sheriff Essick and Assistant Sheriffs, knew that the threat of fentanyl being smuggled into MADF through the booking area posed a threat to inmate safety, and that the MADF staff often "interdicted" drugs inside the MADF. Plaintiffs also emphasize that in August 2020, approximately two and a half months before Marcotte and Pimentel overdosed, another inmate at MADF had a non-fatal overdose on fentanyl in her cell. Saxton Pls' Ex. 6.

Plaintiffs have identified MADF policies and practices that they contend are inadequate, and they also contend that to the extent there were policies in place, many of those policies were not followed, evidencing inadequate training on those policies. *See generally* Expert Reports of Richard Subia (Saxton Pls' Ex. 8) and Phil Stanley (Cajina Decl. Ex. 5). These alleged inadequacies include (1) failure to appropriately screen arrestees prior to admittance in book/wait area; (2) failure to classify inmate workers appropriately; (3) failure to appropriately supervise inmates working in booking area; and (4) failure to appropriately search inmate workers prior to returning to MADF main area.

### A.    Failure to Appropriately Screen Arrestees Prior to Booking Area

The Sonoma County Sheriff's Office Custody Manual states, in relevant part:

**Reception**

**502.1  PURPOSE AND SCOPE**

United States District Court
Northern District of California

The Sonoma County Sheriff's Office has a legal and methodical process for the reception of arrestees into this facility. This policy establishes guidelines for security needs, the classification process, identification of medical/mental health issues, and the seizure and storage of personal property.

. . .

**502.4  SEARCHES BEFORE ADMISSION**

All arrestees and their property shall be searched for contraband by the booking correctional deputy before being accepted for booking. . . . Strip searches shall be conducted in accordance with the Searches Policy.

. . .

**Searches**

510.1  PURPOSE AND SCOPE

The introduction of contraband, intoxicants, or weapons into the Sonoma County Sheriff's Office facility poses a serious risk to the safety and security of staff, inmates, volunteers, contractors, and the public.

510.2  POLICY

It is the policy of this office to ensure the safety of staff, inmates, and visitors by conducting effective and appropriate searches of inmates and areas within the facility in accordance with applicable laws. (15 CCR 1029(a)(6)).

510.3  PAT-DOWN SEARCHES

Pat-down searches will be performed on all inmates/arrestees upon entering the secure booking area of the facility.

510.4.6  BODY SCANNER SEARCH

When a scanner is reasonably available, a body scanner should be performed on all inmates/arrestees upon entering the secure booking area of the facility. . .

The body scanner should generally be used whenever reasonably practicable in place of a modified strip search, strip search or body cavity search of an inmate in housing unless one of those searches is reasonably necessary after the scan.

Saxton Pls' Ex. 7.

The Sonoma County Search Policy states, in relevant part:

**1.0 POLICY STATEMENT**

The Sheriff's Office may conduct pat searches of inmates.  Arrestees and some visitors for the purpose of preventing the introduction of weapons and contraband into detention facilities.  Inmates in the custody of the Sheriff's Office are also subject to strip searches and visual cavity searches for the same reason, based on a legitimate interest to maintain safety and security.  All searches shall be conducted in accordance with applicable state and federal law.

. . .

4.0 (A)  The body scanner will be utilized to scan arrestees, housed inmates, objects and property. The intent is to prevent weapons, drugs and prohibited items from being concealed on or in a person's body that would compromise the safety and security of the jail and staff.

4.0 (B)  The body scanner may be used to search, but is not limited to the following:

- Inmates returning from work assignment, prior to returning to housing

- Inmates returning from court appointments

- Inmates returning to custody from another facility, offsite appointment, or hospital

- All new arrestees during the booking process

- Prior to housing, or transfers between housing locations

- Inmate property

- Inmates who may possess contraband or when contraband is suspected in a housing location

4.0 (D)(1) Absent any other conditions which prevent it (pregnant, intoxicated, combative, medical issues), new arrestees may be scanned.

Subia Report.

Plaintiffs' experts Subia and Stanley opine that these policies and other evidence show that Sonoma County Sheriff officials were aware of the use of the body scanner to prevent the introduction of contraband into MADF, yet they chose to remove the old scanner in August 2020 without a working replacement for a several month period, including the time period at issue in this case. Sheriff Essick testified at his deposition that he and the then-Assistant Sheriff decided to replace the scanner because there was a new scanner technology that did "a better job of interdicting and discouraging narcotics in the jail setting." Essick Depo at 43 (Saxton Pls' Ex. 1). Sheriff Essick testified that the new scanner was delivered in August 2020 but it was not being used in October 2020 due to an "integration issue" with MADF's computer network and data system. *Id.* at 45. Once those technical issues were resolved, the new scanner was used. *Id.*[2] During the several month period when MADF was not using the body scanner, MADF relied solely on pat searches and strip

---

[2] Lieutenant Cleek testified that MADF did not use a body scanner between July 29, 2020 and November 4, 2020, and that the delay was due, at least in part, to need to train staff on how to use the new body scanner. Cleek Depo at 55-56 (Saxton Pls' Ex. 22).

searches to detect contraband coming into the jail.  *Id.*   Essick also testified that he did not direct

that any additional security or search measures be taken during the time period that MADF was not

using a body scanner, and he stated that pat searches and strip searches are the "baseline standard"

and that a body scanner is an "enhancement."  *Id.* at 46, 74.  At the hearing, plaintiffs emphasized

the fact that during this same time period when the body scanner was inoperative, another inmate

overdosed from fentanyl in her cell.

**B.     Failure to Classify Inmate Workers Appropriately (Assignment of Inmates With History of Narcotics to Work in Booking Area)**

MADF's Booking Worker Operations Order (Defs' Ex. V, Ex. 10) provides in relevant part:

GENERAL INFORMATION

The new Booking Worker Crew will be comprised of female inmates from the M.A.D.F.  This will eliminate the need for an N.D.D.F. booking worker to be transported from North County.  Sentenced or unsentenced misdemeanor females from GMOD will be utilized as the new Booking Workers.  We know that this population of inmate(s) can vary at different times.  In the event we cannot find any appropriate sentenced or unsentenced inmate(s), we will use non-violent unsentenced felons.  Primarily drug offenses, burglary, forgery, etc. would be used to fill the vacancy. . . .

. . .

ELIGIBIITY FOR BOOKING WORKER

1.    Must be a GP inmate.

2.    No work restrictions.

3.    No Gang members or associates.

4.    No violent charges.

5.    No in custody positive tests for drugs.

6.    No major in or out of custody keep aways issues.

7.    No major write-ups in the last 30 days.

8.    No minor rule violations in the last two weeks.

9.    A good recommendation by the Module Officers regarding her work habits.

Def's Ex. V, Ex. 10.  At his deposition, Sheriff Essick testified that MADF classified inmates in

custody based on their in-custody behavior, not their previous criminal history.  Essick Depo. at 135

(Pls' Ex. 1).

Plaintiffs' experts opine that inmates with prior drug related offenses, such as Tiffany Pimentel, should not have been assigned to the book/wait area. Pimentel was booked into MADF in or about September 2020, and on October 18, 2020, Deputy Courtney Roualdes approved Pimentel to be a Booking Worker. Defs' Ex. C, Ex. 6. Pimentel had been booked into MADF on prior occasions, and had been caught with contraband on three occasions: (1) in November 2013, a deputy found a bag of what appeared to be crystal meth by Pimentel's foot during a pat search in the pedestrian sallyport, which is outside the entrance to MADF's booking area; (2) in January 2019, Pimentel had pruno in her cell; and (3) in June 2020, Pimentel was found to have saved a pill from her medication pass in her cell. Defs' Ex. B, C, S. According to plaintiffs' experts, Pimentel had a recent history of drug offenses, including three charges for drug offenses in 2020.

### C.    Failure to Appropriately Supervise Inmates Working in Booking Area

The Sonoma County Sheriff's Office Custody Manual states, under Policy 502.6.2 "INMATE SEPARATION" that "Inmates should be kept separate from the general population during the admission process." Saxton Pls' Ex. 7.[3] Lieutenant Cleek testified that the staff who are stationed adjacent to the book/wait area are supposed to observe the individuals in the book wait area to make sure arrestees are staying seated and are separated from one another. Cleek Depo. at 39-40 (Saxton Pls' Ex. 22). In addition, there is a MADF policy stating that deputies "shall" conduct safety checks at least twice every hour, no less than 10 minutes apart. Policy 504.3.

Plaintiffs assert that the surveillance video footage from the book/wait area shows that these policies were not followed. The Court has reviewed the entire footage. That footage shows that Pimentel interacted with Thompson and Navarro numerous times during the four hours that Pimentel was assigned to work in the book/wait area, including Pimentel sitting near Thompson and talking to Thompson by the telephones. Staff who were stationed adjacent to the book/wait area did not

---

[3] At his deposition, Sheriff Essick was asked about Policy 502.6.2, and he stated that the word "should" was permissive and that he thought there were benefits to allowing inmates and arrestees to interact, such as allowing arrestees to ask inmates questions that they would not want to ask deputies. Essick Depo. at 138, 140-41.

appear to be observing the individuals in the book/wait area, nor did any staff intervene at any point to separate Pimentel from Thompson and Navarro. Plaintiffs have also submitted declarations from former MADF inmates who state that when they worked in the booking area, they were allowed to freely interact with arrestees and that deputies did not closely monitor the book/wait area. *See* Wellar Decl. ¶ 12 (Saxton Pls' Ex. 15); Niehoff Decl. ¶¶ 3, 11 (Saxton Pls' Ex. 17).[4]

### D.     Failure to Appropriately Search Inmate Workers Prior to Return to MADF Main Area

The Booking Worker Operational Order states, in relevant part, that when a Booking Worker completes her work assignment, "the Female Booking Officer will conduct a <u>visual strip search</u>. [The booking worker] will be dressed into her blue clothing and wait for Movement to escort her back to the unit." Def's Ex. C, Ex. 12.[5] Plaintiffs claim that MADF staff did not always follow these policies, and have submitted declarations from three former MADF inmates who state that they were booking workers and that they were not always searched (pat searched or strip searched) after they finished working in the book/wait area before returning to their housing modules. Wellar Decl. ¶¶ 1, 3, 9:  Silver Decl. ¶¶  1, 2, 5 (Saxton Pls' Ex. 16); Niehoff Decl. ¶¶ 1, 3, 4.

## III.    Procedural History

In prior orders, the Court held that because Marcotte had pled guilty and was awaiting sentencing at the time of her death, she should be treated as a convicted prisoner rather than a pretrial detainee, and thus the Eighth Amendment governed the analysis of whether defendants acted with

---

[4]  Although defendants did not file an objection to these declarations, at the hearing defense counsel objected that these declarations lack foundation and contain hearsay. The Court agrees with the defense that some portions of these declarations lack foundation and contain hearsay. However, to the extent the former inmate workers describe their own personal experiences as inmate workers and what they observed, those statements are admissible.

[5]  The Booking Worker Operational Order also provides that prior to a Booking Worker starting her shift, "Movement officers will pick up the Booking Worker from the module. The module officer will pick up the Booking Worker from the module. The module officer will conduct a cursory pat search on the inmate prior to being escorted out of the unit. Movement will escort the female to the booking showers to be dressed out into an orange jumpsuit. A female movement or booking officer will dress the inmate in."

United States District Court
Northern District of California

1  deliberate indifference to Marcotte's constitutional rights.  The Court also dismissed the first cause

2  of action, which was brought by the Saxton plaintiffs pursuant to 42 U.S.C. § 1983, alleging that

3  defendants failed to intervene to protect Marcotte.

4      The remaining causes of action in the first amended consolidated complaint are: (1) second

5  cause of action, brought by the Saxton plaintiffs pursuant to 42 U.S.C. § 1983 against the County

6  and former Sheriff Essick, alleging unconstitutional policies, practices and customs; (2) third cause

7  of action, brought by Saxton plaintiffs pursuant to 42 U.S.C. § 1983 against the County and former

8  Sheriff Essick, alleging failure to train; (3) fourth cause of action, brought by the Saxton plaintiffs

9  against Sheriff Essick, alleging negligence; (4) fifth cause of action, brought by the Saxton plaintiffs

10 against Sheriff Essick, alleging negligent hiring, retention and supervision; and (5) eighth cause of

11 action, brought by McGinnis pursuant to 42 U.S.C. § 1983 against the County, alleging

12 unconstitutional policies, practices and customs.[6]

### LEGAL STANDARD

15     Summary judgment is proper if "the movant shows that there is no genuine dispute as to any

16 material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

17 moving party bears the initial burden of demonstrating the absence of a genuine issue of material

18 fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, has no burden

19 to disprove matters on which the non-moving party will have the burden of proof at trial.  The

20 moving party need only demonstrate to the Court that there is an absence of evidence to support the

21 non-moving party's case.  *Id*. at 325.

22     Once the moving party has met its burden, the burden shifts to the non-moving party to "set

23 out 'specific facts showing a genuine issue for trial.'"  *Id.* at 324 (quoting then-Fed. R. Civ. P. 56(e)).

24 To carry this burden, the non-moving party must "do more than simply show that there is some

25 metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

26 *Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be

27

28     [6]  The Saxton plaintiffs voluntarily dismissed the sixth and seventh causes of action for
negligent and intentional infliction of emotional distress.  Dkt. No. 137.

1    insufficient; there must be evidence on which the jury could reasonably find for the [non-moving

2    party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

3    In deciding a summary judgment motion, the court must view the evidence in the light most

4    favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.

5    "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

6    from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment."

7    *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to

8    raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*,

9    594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R.

10    Civ. P. 56(c).

11

12                                                    **DISCUSSION**

13    **I.     Defendants' Motion for Summary Judgment**

14          **A.     Second Cause of Action:  42 U.S.C. § 1983, *Monell* claim for unconstitutional
                 custom, practice or policy**

15               1.     **Claim against the County**

16    Defendants contend that the County did not violate Marcotte's Eighth Amendment right to

17    be provided reasonable measures to guarantee her safety or Marcotte's daughter M.J.'s Fourteenth

18    Amendment right to the companionship of her mother.[7]   The parties agree that the deliberate

19    indifference standard applies to analyze whether plaintiffs' constitutional rights were violated: "To

20    prove a violation of the Eighth Amendment, a plaintiff must show that the defendant: (1) exposed

21    her to a substantial risk of serious harm; and (2) was deliberately indifferent to her constitutional

22    rights." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1248 (9th Cir. 2016).  However, the parties

23

24    ———————————————
          [7]  M.J.'s claim is derivative of the Estate's, and governed by the same analysis. *See  Smith
25    v. City of Fontana*, 818 F.2d 1411, 1420 (9th Cir. 1987), overruled on other grounds by *Hodgers-
      Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) ("Therefore, the same allegation of excessive
26    force giving rise to Mr. Smith's substantive due process claim based on his loss of life also gives
      the children a substantive due process claim based on their loss of his companionship."); *Cotta v.
27    Cnty. of Kings*, 686 F. App'x 467, 469 n.1 (9th Cir. 2017) (children's substantive due process claim
      for loss of familial relationship "is derivative" of claim of decedent's estate and "therefore properly
28    dismissed for identical reasons").

United States District Court
Northern District of California

disagree on whether that standard is solely objective or also contains a subjective element. Citing cases involving claims against prison officials such as *Farmer v. Brennan*, 511 U.S. 825 (1994), defendants contend that deliberate indifference must satisfy both an objective and subjective test, and that plaintiffs cannot satisfy that standard because there is no evidence showing that any county employee actually knew of and disregarded an excessive risk to Marcotte's health or safety. Defendants also contend that MADF's policies, practices and customs are constitutional.

Plaintiffs argue that they need only show objective deliberate indifference to prove municipal liability, and they contend that they have raised a triable issue of fact on their *Monell* claim. Plaintiffs also state that their theory of municipal liability is one of inaction: that the County failed to appropriately screen arrestees, failed to assign inmates without a history of narcotics use to the booking area, failed to appropriately supervise inmates assigned to the booking area, and failed to search inmate workers prior to their return to the main area of the jail.

"To prove a violation of the Eighth Amendment, a plaintiff must show that the defendant: (1) exposed her to a substantial risk of serious harm; and (2) was deliberately indifferent to her constitutional rights." *Mendiola-Martinez v. Arpaio*, 836 F.3d at 1248. "While a claim of deliberate indifference against a prison *official* employs a subjective standard, *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970, we recently held that an objective standard applies to municipalities 'for the practical reason that government entities, unlike individuals, do not themselves have states of mind.'" *Id.* (emphasis in original, quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc)). In *Mendiola-Martinez*, the Ninth Circuit applied an objective standard to a prisoner's *Monell* claims that a county violated her Eighth Amendment rights when she was shackled and restrained while giving birth and during postpartum recovery. *Id.* at 1248-49.[8] The Ninth Circuit instructed, "[t]his *Castro* objective standard is satisfied when 'a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission [or act] is substantially certain to result in the violation of the constitutional rights of their

---

[8] In *Mendiola-Martinez*, the plaintiff was a detainee who, like Marcotte, had been convicted but not yet sentenced at the time she gave birth to her child. *Id.* at 1243.

United States District Court
Northern District of California

citizens.'" *Id.* at 1249 (quoting *Castro*, 833 F.3d at 1076).[9]

"Under *Monell*, a local government body can be held liable under § 1983 for policies of inaction as well as policies of action." *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). "A policy of action is one in which the governmental body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a government body's failure to implement procedural safeguards to prevent constitutional violations." *Id.* "In inaction cases, the plaintiff must show, first, that [the] policy amounts to deliberate indifference to the plaintiff's constitutional right." *Id.* "This requires showing that the defendant was on actual or constructive notice that its omission would likely result in a constitutional violation." *Id.* "Second, the plaintiff must show that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy." *Id.*

The Court concludes that there are triable issues of fact as to whether county policymakers were on actual or constructive notice of the various deficiencies in the policies identified by plaintiffs and on actual or constructive notice that those deficiencies were substantially certain to result in the death of an inmate due to a fentanyl overdose. Viewed in the light most favorable to plaintiffs, the evidence shows that MADF staff, including Sheriff Essick, were aware of the security risks flowing from the infiltration of contraband into MADF, and of the particular lethal danger posed by fentanyl. *See, e.g.*, Saxton Pl's Ex. 2 and *see generally* Essick Depo. The evidence shows that MADF staff were aware that contraband could enter MADF through the booking area and that

---

[9] The Court relied on *Farmer* when dismissing the Saxton plaintiffs' first cause of action for failure to intervene. Dkt. No. 144. To the extent the Court held that there is a subjective element to deliberate indifference for a municipality, that was an error. However, it is not clear to the Court what plaintiffs' "failure to intervene" theory is with respect to the County. In the briefing on defendants' motion to dismiss that cause of action, both parties only cited case law discussing "failure to intervene" claims brought against individual prison officials, not municipalities, and in those cases the plaintiffs alleged that individual deputies made intentional decisions about the inmate's medical care or housing placements. *See, e.g.*, *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (claims for inadequate health care against individual deputies); *Castro*, 833 F.3d at 1067-68 (failure to protect inmate from violence brought against individual deputies). Here, plaintiffs have never claimed that any deputies or Sheriff Essick made any intentional decisions about Marcotte's conditions of confinement that led to her death, and instead plaintiffs claim that the County violated Marcotte's rights through its failures to act in various ways. In any event, the gravamen of the first cause of action – that the County failed to take various security and other measures that allowed fentanyl to be introduced into MADF, causing Marcotte's death – is the same basic theory advanced in the second and third causes of action.

inmate workers working in the booking area would attempt to get contraband while working in the booking area. However, in the months leading up to Marcotte's death, including after another inmate overdosed on fentanyl in her cell, MADF's body scanner was inoperable and MADF did not use any alternative measures in place of the body scanner, instead relying solely on pat searches and strip searches. Plaintiffs have introduced evidence that even these pat and strip searches were not always performed on inmate workers who worked in the booking area. The Court finds it significant that the surveillance video footage of the book/wait area from October 28, 2020, shows that Pimentel interacted with Thompson and Navarro multiple times, often sitting close to them and talking to them, and that Pimentel, Thompson and Navarro repeatedly went to the bathroom and later appeared visibly intoxicated, as noted in the MADF investigative report. A reasonable jury could conclude that there was little to no supervision of Pimentel while she was working, and that MADF deputies either did not notice what was going on in the book/wait area, or did notice and took no action. For these and the other reasons articulated by plaintiffs in their papers, the Court finds that there are triable issues of fact as to whether the County's policies of inaction allowed fentanyl to enter the jail and cause Marcotte's death and DENIES summary judgment on this cause of action.

### 2.    Claim against Sheriff Essick

Defendants contend that Sheriff Essick is entitled to qualified immunity because in 2020 there was no clearly established law "recognizing a viable Eighth Amendment claim for failing to prevent an inmate's drug overdose." Mtn. at 19. Plaintiffs argue that defendants are framing the constitutional right too narrowly, and that the right at issue here is Marcotte's right to safety and security while she was in custody, which they argue has been clearly established for decades.

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). "[F]or a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at 79 (quoting *Mullenix*, 577 U.S. at 12). "'[C]learly established law' should not be defined 'at a high level of generality.'" *Id.* (quoting

*Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)).  "[T]he clearly established law must be 'particularized' to the facts of the case."  *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "Thus, in order to ensure that government officials receive necessary guidance, courts should focus the qualified immunity inquiry at the level of implementation."  *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir. 1998).  "The plaintiff shoulders the burden of proving that the rights he claims are 'clearly established.'"  *Id.* (quoting *Davis v. Scherer*, 468 U.S. 183, 197 (1984)).

The Court concludes that Sheriff Essick is entitled to qualified immunity on the Saxton plaintiffs' § 1983 claims.  Plaintiffs are correct that by no later than 1989, the Supreme Court held that inmates in correctional institutional have constitutional rights to safety and care.  *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.").  While the Supreme Court and Ninth Circuit have repeatedly reaffirmed that inmates have a constitutional right to reasonable safety, neither court has done so at "the level of implementation" or the "particularized facts" of addressing an inmate's right to be safe from the unfettered flow of particularly lethal drugs like fentanyl into a jail.  The Court is mindful of the fact that smuggling of contraband, including drugs, into prisons and jails is an endemic problem.  The Court has concluded that plaintiffs have viable constitutional claims based on the particular facts of this case, and the Court disagrees with defendants' assertion that this is a "run-of-the-mill drug-overdose case."  Mtn. at 20.  However, precisely because of the unusual nature of this case, combined with the absence of Ninth Circuit or Supreme Court cases discussing the constitutional rights of prisoners under closely analogous facts, the Court finds that Sheriff Essick is entitled to qualified immunity on the second and third causes of action.

**B.    Third Cause of Action:  42 U.S.C. § 1983, *Monell* claim for inadequate training**

At the hearing, the Saxton plaintiffs clarified that while the second cause of action is based

15

on the County's failure to enact various policies and procedures, the third cause of action focuses on the County's failure to train on existing policies and procedures, including the failure to train staff on the body scanner during the several month period the new body scanner was not used. "A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). "A 'pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train,' though there exists a 'narrow range of circumstances [in which] a pattern of similar violations might not be necessary to show deliberate indifference.'" *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal citations and quotation marks omitted)). However, "[a] plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Long*, 442 F.3d at 1186 (quoting *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).

For largely the same reasons as set forth above, the Court finds that there are triable issues of fact on the failure to train cause of action. Plaintiffs have identified MADF policies that they contend were not followed, such as written policies prohibiting inmate workers from interacting with recent arrestees and directing deputies to make regular rounds in the book/wait area, and have submitted evidence in support of these claims. As such, the Court DENIES defendants' motion for summary judgment on this *Monell* claim.

### C.      Fourth Cause of Action for Negligence

The fourth cause of action for negligence is brought by the Estate of Amber Marcotte and on behalf of Saxton as guardian ad litem for daughter M.J. against Sheriff Essick. "The elements of a cause of action for negligence are (1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate cause between the breach and (4) the plaintiff's injury." *Mendoza v. City of Los*

*Angeles*, 66 Cal. App. 4th 1333, 1339 (1998). "In California, prison officials owe detainees a duty to protect them from foreseeable harm." *Cotta*, 686 F. App'x at 469 (citing *Giraldo v. Cal. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 252-53 (2008)). "This standard requires a much lower level of culpability than deliberate indifference." *Id.* (citing *Castro*, 833 F.3d at 1071); *see also Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) ("The sheriff is required by statute to take charge of and keep the county jail and the prisoners in it, and is answerable for the prisoner's safekeeping.") (citing Cal. Gov't Code §§ 26605, 26610; Cal. Pen. Code § 4006; *Brandt v. Board of Supervisors*, 84 Cal. App. 3d 598, 601 (1987)), abrogated on other grounds by *Farmer*, 511 U.S. 825.

Defendants move for summary judgment on plaintiffs' negligence claims, contending that the Estate's claim is barred for failure to file a tort claim, and that M.J.'s claim is barred by discretionary immunity.

### 1.    Estate of Amber Marcotte

Saxton filed a tort claim with the County on behalf of M.J. regarding Marcotte's death. Defs' Ex. W. Under "Description of Claimant's injury, property damage or loss," the claim states,

> Claimant is the two year old daughter of the decedent. She has endured pain and suffering, which is ongoing, from losing her mother. She has also suffered psychological and emotional trauma and has lost all future support of her mother. At this time, damages are ongoing and cannot be finally determined, but are in excess of $1,000,000.

*Id.* Defendants contend that because the Estate did not file a separate tort claim seeking damages on its own behalf, the Estate's negligence claim is barred. The Saxton plaintiffs contend that defendants are putting "form over substance," and they state that M.J. is the sole beneficiary of her mother's estate and that her tort claim therefore embraces the claim of the Estate.

"An injured party may not maintain an action against a public entity unless a claim has been presented to the entity." *Nelson v. Cnty. of Los Angeles*, 113 Cal. App. 4th 783, 796-97 (2003) (citing Cal. Gov't Code §§ 911.2, 945.4.). "Where two or more persons suffer separate and distinct injuries from the same act or omission, each person must submit a claim, and one cannot rely on a claim presented by another." *Id.* "Because this rule is based on the purpose of the claim statutes—

United States District Court
Northern District of California

17

which is to provide sufficient information to enable the entity to adequately investigate claims and to settlement, if appropriate, without the expense of litigation—the statutory requirements have not been met by the person who has not filed a claim, and the doctrine of substantial compliance (which applies only when there is a defect in form but the statutory requirements have otherwise been met) does not apply." *Id.* (internal citation omitted).

In *Nelson*, the California Court of Appeal held that a mother who filed a claim "for the loss of her son" with no mention in the claim of damage incurred by her son before he died could not pursue claims asserted on behalf of her son's estate (negligence, assault and battery) because there was nothing in the mother's tort claim to suggest that it encompassed the claims of the estate. Here, as in *Nelson,* there is nothing in M.J.'s tort claim that references the Estate of Amber Marcotte or Marcotte's own injuries to put the County on notice that the claim was also filed on behalf of the Estate. As such, the Court concludes that M.J.'s tort claim is limited to her own injuries, and GRANTS this aspect of defendants' motion for summary judgment.

## 2.    Claim by M.J./Discretionary Immunity

Defendants move for summary judgment on M.J's negligence claim against Sheriff Essick on the ground that Essick is immune under California Government Code Section 820.2. That section provides that "a public employee is not liable for an injury resulting from his act . . . where the act . . . was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov't Code § 820.2. The California Supreme Court has stated that "the existence of some . . . alternatives . . . does not perforce lead to a holding that the governmental unit thereby attains the status of non-liability under section 820.2." *Johnson v. State*, 69 Cal. 2d 782, 790 (1968) (holding decision of parole officer as to what warnings to give foster parents was not the type of policy decision immunized by section 820.2). "Thus, instead of interpreting 'discretionary' literally, the focus should be on the policy considerations underlying the governmental entity's claim of immunity." *Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1161 (9th Cir. 2019) (citing *Johnson*, 69 Cal. 2d at 787-89).

United States District Court
Northern District of California

> [A] "workable definition" of immune discretionary acts draws the line between "planning" and "operational" functions of government.  Immunity is reserved for those "*basic policy decisions* which have been expressly committed to coordinate branches of government," and as to which judicial interference would thus be "unseemly."  Such "areas of quasi-legislative policy-making are sufficiently sensitive" to call for judicial abstention from interference that "might even in the first instance affect the coordinate body's decision-making process[.]"
>
> On the other hand, . . . there is no basis for immunizing lower-level, or "ministerial," decisions that merely implement a basic policy already formulated.  Moreover, we cautioned, immunity applies only to deliberate and considered policy decisions, in which a "[conscious] balancing [of] risks and advantages . . . took place. The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision."

*Caldwell v. Montoya*, 10 Cal. 4th 972, 981 (1995) (internal citations, omissions, and alterations omitted, italics in original) (quoting *Johnson*, 69 Cal. 2d at 793-96); *see, e.g.*, *Steinle*, 919 F.3d at 1161-62 (finding discretionary immunity under section 820.2 for sheriff writing memo outlining policy of limited disclosure to federal immigration officials about inmates released from county jail because sheriff had sole authority for writing policy, and memo showed that he weighed risks and advantages in setting policy).  Defendants have the burden to demonstrate that immunity applies. *See Johnson*, 69 Cal. 2d at 794 n.8 ("[T]he governmental entity, to be entitled to immunity [under section 820.2] must show that its employee actually reached a considered decision knowingly and deliberately encountering the risks that give rise to plaintiff's complaint.").

The Court concludes that defendants have failed to meet their burden to show that M.J.'s negligence claim against Sheriff Essick is barred by discretionary immunity.  Defendants argue that Essick's decision to replace the body scanner without a working replacement or alternative additional safety measures was a policy decision entitled to immunity.[10]  Defendants cite Essick's deposition testimony in which he stated that during the several month period when the body scanner was inoperative, MADF relied on "standard" and "baseline" pat and strip searches and that the scanner is an "enhancement," and defendants emphasize that there is no statute or regulation requiring the use of body scanners.  Essick Depo. at 46.  However, when asked whether he directed that any steps be taken during that time period, Sheriff Essick also testified that he "didn't take any

---

[10]  The parties' briefing only discusses this one basis for M.J.'s negligence claim.  If there are other bases for the negligence claim, the parties will be required to address in the pretrial filings and motions in limine, if necessary, whether those other bases for the negligence claim are barred by discretionary immunity.

United States District Court
Northern District of California

steps" and that there was never any discussion at the weekly executive management staff meeting about whether there should be other methods put in place. *Id.* at 46, 68, 74. A fair reading of this testimony is that Sheriff Essick did not engage in a deliberate and considered policy decision about whether to implement any additional measures when the body scanner was inoperable, and instead that the "decision" to proceed solely with pat and strip searches occurred as a matter of default. *Cf. Estate of Abdollahi v. County of Sacramento*, 405 F. Supp. 2d 1194, 1214 (E.D. Cal. 2005) ("[P]olicy decisions regarding the choice of elements to include in jail detoxification programs and suicide prevention programs are the types of basic policy decisions that the legislature granted immunity for in § 820.2."). Accordingly, the Court DENIES defendants' motion for summary judgment on this claim.

### D.    Fifth Cause of Action for Negligent Hiring, Retention and Supervision

"An employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit." *Roman Catholic Bishop v. Superior Court*, 42 Cal. App. 4th 1556, 1564-65 (1996). "California case law recognizes the theory that an employer can be liable to a third person for negligently hiring, supervising, or retaining an unfit employee." *Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1054 (1996). "Liability is based upon the facts that the employer knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes." *Id.* "Liability for negligent supervision and/or retention of an employee is one of direct liability for negligence, not vicarious liability." *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (2006).

Defendants contend that any hiring or training decisions by Sheriff Essick are discretionary and therefore immunized under section 820.2. Defendants also argue that there is no evidence that Essick had knowledge that any of the deputies working on October 28 or 29 in the booking area were unfit to perform their job duties. In response, the Saxton plaintiffs cite Sheriff Essick's deposition testimony in which he stated that he was a "very hands-on manager" who was "deeply involved in all operations of the Sheriff's Office [and] of my subordinates" and that he was very engaged in supervision and "being present throughout the office." Essick Depo. at 57, 68-69.

Plaintiffs also cite evidence showing that Essick was aware of the opioid/fentanyl crisis in Sonoma County and that inmates attempted to, and did, smuggle drugs into MADF.

The Court finds that there are triable issues of fact as to whether Sheriff Essick's supervision was negligent. Viewed in the light most favorable to plaintiffs, the evidence shows, *inter alia*, that on October 28 Pimentel was allowed to interact with Thompson and Navarro for extended periods of time over the course of four hours, and that at various times Pimentel, Thompson and Navarro were visibly intoxicated. The surveillance footage shows that deputies did not intervene or even appear to notice, nor did they conduct regular rounds in the book/wait area, despite policies requiring them to do so. This evidence, combined with Essick's testimony about his engagement and involvement as a supervisor, raises triable issues of fact. Further, nothing about this evidence suggests that Essick engaged in discretionary policy decisions regarding supervision. The Court DENIES summary judgment on this claim.

### E.    Eighth Cause of Action for Loss of Familial Relationship

This is the only cause of action brought by plaintiff Katrina McGinnis, who is Marcotte's mother. The parties agree that this cause of action rises or falls with the Saxton plaintiffs' § 1983 claims against the County. For the same reasons that the Court denied summary judgment on those claims, the Court DENIES defendants' motion for summary judgment on this cause of action.

## II.    Administrative Motions to Seal

### A.    Defendants' Administrative Motion to Seal (Dkt. No. 185)

The Court GRANTS defendants' motion to seal Exhibits F through N, S, W, and X based on the showing of confidentiality made in the Southard declaration. The Court DENIES defendants' motion to seal Exhibit B because the Southard declaration simply states that Exhibit B has been marked confidential by the parties but does not demonstrate "compelling reasons" to seal that exhibit. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006); N.D. Cal. Civil Local Rule 79-5(c) ("Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions

United States District Court
Northern District of California

thereof, are sealable.").

### B.    Saxton Plaintiffs' Administrative Motion to Seal (Dkt. No. 190)

Pursuant to Civil Local Rule 79-5, the Saxton plaintiffs filed an administrative motion to seal material that has been designated as confidential by defendants.  That rule provides that "[w]ithin 7 days of the motion's filing, the Designating Party must file a statement and/or declaration as described in subsection (c).[11]  A failure to file a statement or declaration may result in the unsealing of the provisionally sealed document without further notice to the Designating Party."

Here, the designating party – defendants – did not file a timely statement or declaration demonstrating why the material at issue should be filed under seal.  Nevertheless, the Court provided an additional opportunity to defendants to make such a showing no later than June 13, 2025.  On June 13, defendants filed a "statement of non-opposition" stating that they do not oppose plaintiffs' motion to seal.  The statement of non-opposition does not, as required by Civil Local Rule 79-5(c) and (f), provide a specific statement of the reasons for keeping the documents under seal.  As such, the Court DENIES plaintiffs' administrative motion.  *See* Civil Local Rule 79-5(c), (f); *Kamakana*, 447 F.3d at 1179.

---

[11] Civil Local Rule 79-5(c), titled "Contents of Motion to Seal," states,

Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable. . . . This requirement applies even if the motion is joined by the opposing party.  The motion must include the following:

(1) a specific statement of the applicable legal standard and the reasons for keeping a document under seal, including an explanation of:

(i) the legitimate private or public interests that warrant sealing;

(ii) the injury that will result if sealing is denied; and

(iii) why a less restrictive alternative to sealing is not sufficient;

(2) evidentiary support from declarations where necessary; and

(3) a proposed order that is narrowly tailored to seal only the sealable material, and which lists in table format each document or portion thereof that is sought to be sealed.

United States District Court
Northern District of California

## CONCLUSION

For the reasons set forth above, the Court GRANTS defendants' motion for summary judgment on the Saxton plaintiffs' § 1983 claims against Sheriff Essick on the basis of qualified immunity, and GRANTS defendants' motion for summary judgment on the Estate's negligence claims for failure to file a tort claim. The Court DENIES the balance of defendants' motion, finding there are triable issues of fact.

**IT IS SO ORDERED**.

Dated: June 17, 2025

SUSAN ILLSTON
United States District Judge